IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80156-2-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| TIMOTHY BASS, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — In 2019, a jury convicted Timothy Bass of felony murder arising out of the 1989 kidnapping, rape, and death of Amanda Stavik. On appeal, Bass challenges, among other things, the admissibility of DNA (deoxyribonucleic acid) evidence linking him to the crime, the constitutionality of charging Bass under a felony murder statute amended after the crime occurred, and the sufficiency of evidence of kidnapping or rape.

Although we conclude the trial court erred in applying a 1990 version of the felony murder statute to this 1989 crime, this error was harmless beyond a reasonable doubt. We reject Bass's remaining arguments and affirm his conviction.

FACTS

In November 1989, 18-year-old Amanda Stavik, a freshman at Central Washington University, returned home to rural Whatcom County with her college roommate, Yoko, to celebrate Thanksgiving with her family. Stavik and Yoko caught a ride home with Stavik's former boyfriend, Rick Zender, a student at the same college. Zender dropped Stavik and Yoko at home around 2:00 p.m. on Wednesday, November 22, 1989. Later that afternoon, Stavik visited friends at her former high school during the girls' basketball team practice.

On Thanksgiving Day, Thursday, November 23, 1989, Stavik spent the entire day at home with her family. Stavik did not leave the house that day.

On Friday, November 24, 1989, Stavik spent the morning hanging out and eating leftovers with her family and taking a walk with Yoko. Stavik made plans with Yoko to go out that evening with a high school friend, Brad Gorum, and his friend, Tom Bass, Bass's younger brother. Sometime between 2:00 and 3:00 p.m., Stavik decided to go for a run with the family dog, Kyra. According to Mary,[1] Stavik's mother, she usually ran west from their house on Strand Road, crossed Highway 9, and continued until she reached the south fork of the Nooksack River and then ran back the same route, a five-mile round trip. This path took Stavik past Bass's residence, located on Strand Road, just east of the river.

While there was conflicting evidence as to the route Stavik ran that day, her brother, Lee, who was playing with a friend at a neighboring home, and another

---

[1] Where witnesses share a last name we refer to those parties by their first names. We do so for clarity and intend no disrespect.

eyewitness, David Craker, both saw Stavik running east on Strand Road toward her home around 3:00 p.m. Craker said Stavik was within minutes of her house.

When Lee returned home, however, neither Stavik nor the dog were there. Mary, growing concerned, began calling neighbors and Stavik's friends to see if anyone had seen her. Lee and Mary went out and looked for her on the road, but were unable to find her. Not long after, the dog, Kyra, returned home without Stavik. The dog cowered, with tail tucked, and had river silt covering part of her hind quarters. Gorum, Tom Bass, and Zender showed up to help look for Stavik when they heard of her disappearance.

Around 5:30 p.m. Mary called the police and the Whatcom County Search and Rescue, and Allen Pratt, a human tracker, responded and began a widespread search for Stavik. Pratt found a disturbed spot on the shoulder of the road near the corner close to the Stavik house. There were several footfalls, possibly from two people, which "looked like somebody had been walking or wrestling around or something." The nearby grass also showed signs of disturbance. There was river silt in a nearby ditch, similar to that found on the dog.

On Monday, November 27, 1989, law enforcement found Stavik's naked body in shallow, slow-moving water of the Nooksack River significantly upstream from where Stavik was last seen on Strand Road. Investigators found footfalls and tire tracks in a nearby field, known as the "homestead," a local, isolated hangout for teenagers, but they were unable to determine if these were related to the crime because of the number of people who had been there. They found no other tracks or signs of disturbance near the riverbank where they found Stavik's body.

Ultimately, no crime scene was ever located and investigators were unable to conclude where Stavik went into the river.

Stavik was naked except for her running shoes and her body was covered in scratches on her legs, buttocks, and arms. There were more scratches on the front and sides of her legs than on the backs of them. Many of the scratches were parallel, indicating she was in motion when she was scratched, and the overall condition of the scratches suggested they occurred while she was still alive. Whatcom County medical examiner Dr. Gary Goldfogel opined that these scratches were consistent with someone running through brush, such as the blackberry bushes found along the riverbank where her body was found.

Dr. Goldfogel performed an autopsy on November 28, 1989. The autopsy indicated no defensive injuries to her hands, no foreign DNA under her fingernails, and no evidence of strangulation or evidence suggesting she had been bound in any way. There was, however, a blunt force trauma injury to Stavik's right forehead. Dr. Goldfogel testified that the blow to Stavik's head would have caused a significant concussion, but he could not say she necessarily lost consciousness. Dr. Goldfogel opined that the injury happened immediately before or after her death, because "[b]y the time her heart stops and the blood pools, these things don't occur."

Dr. Goldfogel concluded that the cause of death was freshwater drowning. Based on her stomach contents, Dr. Goldfogel estimated she died within three to four hours of her last meal. Stavik's family testified she last ate before she went walking with her roommate, between 11:30 a.m. and 12:30 p.m., on the day she

- 4 -

disappeared. The evidence thus suggested she died between 3:30 and 4:30 p.m. on Friday afternoon.

During the autopsy, Dr. Goldfogel found semen in Stavik's vagina and, based on the sperm count, concluded sexual intercourse had occurred no more than 12 hours before her death. This evidence led the State to conclude that someone had kidnapped and raped Stavik while she was out on her Friday afternoon run and that she had died while fleeing her captor.

Dr. Goldfogel preserved the samples he collected and sent them to the Federal Bureau of Investigation and the Washington State Patrol Crime Lab for analysis. The Crime Lab developed a male DNA profile from the sperm. The police investigation led to several suspects whom they later excluded when their DNA did not match the DNA in the sperm sample. Eventually, the case went cold.

In 2009, Detective Kevin Bowhay reopened the investigation and began asking for DNA samples from anyone who lived in the area or who may have had contact with Stavik near the time of her death. Over the course of the investigation, Bowhay and his team collected more than 80 DNA samples for testing.

In 2013, Detective Bowhay asked Bass for a DNA sample. When Detective Bowhay indicated he was investigating Stavik's death, Bass acted as if he did not know who she was, "looked up kind of, um, kind of like he was searching his memory" and said "oh, that was the girl that was found in the river." Bass told Detective Bowhay that he did not really know Stavik and initially said he did not know where she lived. Bass refused to provide a DNA sample absent a warrant.[2]

---

[2] Testimony related to Bass's refusal to provide a DNA sample was appropriately excluded from trial.

Police contacted Bass again in February 2015 in relation to the Stavik investigation. After the second contact, Bass became anxious and told his brother, Tom, that he was worried because he had had sex with Stavik when she had been home for Thanksgiving in 1989. Tom was shocked and asked Bass how that had happened. Bass said " 'Oh, I just went up to her and said, oh, you're keeping fit?' And that was it." Bass told Tom he and Stavik had slept together a couple times before she had gone off to college as well. Bass asked Tom to tell police that Tom had also slept with Stavik, as if implying that Stavik had "slept around."

Several days later, Bass and his then-wife, Gina Malone, had a conversation with Bass's mother, Sandra. Bass asked Sandra if they could agree to tell the police that Bass's deceased father had killed Stavik. Sandra covered her face with her hands and said no.

At this time, Bass was working as a delivery truck driver for Franz Bakery. Detective Bowhay reached out to Kim Wagner, the manager of the Franz Bakery outlet store, hoping to obtain company consent to swab the delivery trucks for "touch DNA," or DNA left behind when people touch or use something. Detective Bowhay did not identify the employee he was investigating. Wagner told Detective Bowhay he would need to talk with the corporate offices in order to get permission for any such search and provided him with a phone number for the corporate office. The company refused to give permission to law enforcement to search its vehicles.

Over two years later, in May 2017, Detective Bowhay contacted Wagner again and asked her for the general areas of Bass's delivery route. Wagner asked if he was investigating Stavik's murder. He confirmed he was. She asked if his

investigation was related to Bass; he again confirmed it was. The detective informed Wagner he was looking for items that Bass might cast off that may contain his DNA. Wagner provided Detective Bowhay information regarding Bass's normal route, and Detective Bowhay agreed to update her if he found anything.

Shortly thereafter, Detective Bowhay surveilled Bass as he drove his route, hoping to collect anything Bass discarded, like "cigarette butts, bottles, anything he might have drank from, anything he might have eaten or half eaten and thrown away." He later told Wagner that Bass had not discarded any items. Wagner indicated that she would see if he discarded any items at work, such as water bottles, and asked if that would help. Detective Bowhay said okay, but told her that he was not asking her to do anything for him.

In August 2017, Wagner saw Bass drink water from a plastic cup and throw the cup away in a wastebasket in the bakery's employee break room. She collected that cup and stored it in a plastic bag in her desk. Two days later, she saw Bass drink from a soda can and, again, after he discarded it in the same trash can, she retrieved it and stored it with the cup. Detective Bowhay did not direct Wager to take any items and did not tell her how to handle or package these items.

Wagner contacted Detective Bowhay via text to let him know she had two items Bass had discarded in the garbage. Detective Bowhay met Wagner in the Franz Bakery parking lot, picked up the items, and sent them to the Washington State Patrol Crime Lab for analysis. The Crime Lab confirmed that the DNA collected from Bass's soda can and cup matched the male DNA collected from the semen in Stavik's body.

Law enforcement arrested Bass for Stavik's murder in December 2017. After his arrest, Tom and Sandra visited Bass in jail a number of times. Tom testified about statements Bass made during one of these visits:

He said the cops are lying, everyone is out to get him. Everyone is lying. He said they are going to kill me in here and the main, the main point of it is he said, "I need a strong alibi or I'm going to prison." He said, "Mom, maybe you can say that we were Christmas shopping." "Tom, do what you can." And he said, "Maybe [other friends of theirs] could say that they knew her back then as well.["]

The State charged Bass with first degree felony murder under RCW 9A.32.030(1)(c)(2) and (5), alleging that Bass had caused Stavik's death in the course or furtherance of rape, attempted rape, kidnapping, or attempted kidnapping. In pretrial motions, the trial court denied Bass's motion to suppress the DNA evidence obtained from items Wagner collected at the Franz Bakery.

At trial, Bass conceded that he had sex with Stavik at some point before her death, but argued the presence of his semen inside Stavik did not prove he had kidnapped and raped her. To advance this theory, Bass presented evidence to dispute Dr. Goldfogel's time-since-intercourse testimony. Defense expert Dr. Elizabeth Johnson testified that, after an independent examination of the sperm samples, she believed it more likely that intercourse occurred between 24 to 48 hours before Stavik died. But Dr. Johnson could not rule out a time frame as short as one to six hours before death.

The jury found Bass guilty and returned a special verdict finding that Bass had committed each of the four predicate offenses. The court sentenced Bass to 320 months of incarceration.

ANALYSIS

Bass raises seven assignments of error on appeal. First, he challenges the admissibility of the DNA evidence, arguing Wagner acted as a state agent in conducting a warrantless search in violation of article I, section 7 of the Washington Constitution. Second, he argues there is insufficient evidence to support his felony murder conviction. Third, Bass contends convicting him under the 1990 version of RCW 9A.32.030 for a crime committed in 1989 either violated the prohibition against ex post facto laws or violated his right to due process. Fourth, Bass maintains he received ineffective assistance of counsel when his attorneys failed to object to inadmissible testimony. Fifth, he contends the trial court violated his right to present a defense when it excluded Stavik's diary, precluding him from arguing that Stavik may have died by suicide. Sixth, Bass challenges the trial court's explanation during voir dire that witnesses who testify at trial will be those with relevant information, arguing it was an impermissible judicial comment on the evidence. Finally, he maintains that the cumulative effect of these errors denied him a fair trial. We address each argument in turn.

A. Search and Seizure of Discarded DNA

Bass first challenges the admissibility of the DNA evidence linking him to Stavik. He contends Wagner acted as a state agent when she collected his discarded items without a warrant. We reject this argument because the trial court found Wagner was not an agent at the time she pulled Bass's cup and soda can from the trash and there is substantial evidence supporting this finding.

Under the Washington Constitution "[n]o person shall be disturbed in his [or her] private affairs, or his [or her] home invaded, without authority of law." WASH. CONST. art. I, § 7. Article I, section 7 "is grounded in a broad right to privacy" and protects citizens from governmental intrusion into their private affairs without the authority of law. State v. Chacon Arreola, 176 Wn.2d 284, 291, 290 P.3d 983 (2012). Both article I, section 7 and the Fourth Amendment to the United States Constitution "were intended as a restraint upon sovereign authority; in the absence of state action, they have no application regardless of the scope of protection which would otherwise be afforded under either provision." State v. Ludvik, 40 Wn. App. 257, 262, 698 P.2d 1064 (1985). Thus, "[t]he exclusionary rule does not apply to the acts of private individuals." State v. Smith, 110 Wn.2d 658, 666, 756 P.2d 722 (1988). But evidence discovered by a private citizen while acting as a government agent is subject to the rule. Id.

To prove a private citizen was acting as a government agent, the defendant must show " 'that the State in some way instigated, encouraged, counseled, directed, or controlled the conduct of the private person.' " Id. (internal quotation marks omitted) (quoting State v. Wolken, 103 Wn.2d 823, 830, 700 P.2d 319 (1985)). The " 'mere knowledge by the government that a private citizen might conduct an illegal private search without the government taking any deterrent action [is] insufficient to turn the private search into a governmental one.' " Id. (alteration in original) (quoting State v. Agee, 15 Wn. App. 709, 714, 552 P.2d 1084 (1976)). For an agency relationship to exist, there must be "a manifestation of consent by the principal [the police] that the agent [the informant] acts for the police

- 10 -

and under their control and consent by the informant that he or she will conduct themselves subject to police control." Id. at 670.

Generally, the existence of a principal-agent relationship is a question of fact. Unruh v. Cacchiotti, 172 Wn.2d 98, 114, 257 P.3d 631 (2011); Travelers Cas. & Sur. Co. v. Wash. Tr. Bank, 186 Wn.2d 921, 937-38, 383 P.3d 512 (2016). When a trial court makes findings of fact regarding a private citizen's relationship with the police, we will uphold these findings if they are supported by substantial evidence. Smith, 110 Wn.2d at 668. Substantial evidence exists when there is sufficient evidence in the record " 'to persuade a fair-minded person of the truth of the stated premise.' " State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009) (quoting State v. Reid, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999)).

We then review de novo the court's conclusions of law in denying a motion to suppress. State v. Winterstein, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009). We must determine whether the trial court's findings of fact support its conclusions of law. Garvin, 166 Wn.2d at 249.

The trial court heard live testimony from both Detective Bowhay and Wagner. At the conclusion of this hearing, the trial court found that Wagner was not acting as an agent of Detective Bowhay when she retrieved the plastic cup and soda can from the garbage can at the Franz Bakery outlet store because it was Wagner who conceived the idea to search the garbage, and Detective Bowhay did not direct, entice, or instigate Wagner's search. Bass assigns error to this finding.[3]

---

[3] Although the trial court identified this finding as a conclusion of law, we treat statements incorrectly labeled as conclusions of law as findings of fact. State v. CLR, 40 Wn. App. 839, 843 n.4, 700 P.2d 1195 (1985); State v. Marcum, 24 Wn. App. 441, 445, 601 P.2d 975 (1979).

Bass also assigned error to findings 12, 13, and 16, to the extent the court found that Wagner "acted independently to further her own ends in seizing Bass's plastic cup and soda can." The challenged findings are

     12.    Ms. Wagner indicated that she would see if he discarded any items at work such as water bottles and asked if that would help. Detective Bowhay indicated okay, but that he was not asking her to do anything for him.

     13.    Ms. Wagner testified that she felt a moral obligation to assist in this investigation.

. . . .

     16.    Detective Bowhay had not directed Ms. Wagner to take any items and did not tell her how to handle these specific items or how to package them.

The remaining, unchallenged findings are deemed verities on appeal. State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

We conclude the challenged findings are supported by substantial evidence. Detective Bowhay and Wagner both testified that Detective Bowhay did not ask or encourage Wagner to look for items to seize and did not tell her what type of items to take. Wagner testified Detective Bowhay did not instruct her to find an item containing Bass's saliva; she made that assumption based on her husband's experience in doing an ancestry DNA test and on watching television crime shows. Wagner confirmed that Detective Bowhay did not encourage her to find Bass's DNA and gave her no guidance in how to do so.

Bass argues that because Detective Bowhay knew of and acquiesced to Wagner's search for items Bass might discard at work, the trial court had insufficient evidence supporting its finding of agency. But it is well established in Washington that an agency relationship requires more than mere knowledge or

acquiescence in a private citizen's actions; our courts require evidence the government in some way prompted or motivated the actions of the would-be government agent. See State v. Clark, 48 Wn. App. 850, 856, 743 P.2d 822 (1987) ("Before a private party may be deemed an agent of the State, however, the government must be involved directly as a participant in the search or indirectly as an 'encourager' or instigator of the private citizen's actions."); State v. Walter, 66 Wn. App. 862, 866, 833 P.2d 440 (1992) (concluding a film lab agent who turned evidence over to the State was not an agent due to independent motive and there was "no evidence of 'encouragement' by the police that would render [her] an agent"); State v. Swenson, 104 Wn. App. 744, 755, 9 P.3d 933 (2000) (indicating the State must instigate, encourage, counsel, direct, or control the conduct of the private person for that person to be an agent, and analyzing police behavior for encouragement). Because there is no evidence of police instigation, encouragement, or control over Wagner's activities, the trial court's findings are substantially supported by the record before us.

Bass alternatively argues Detective Bowhay instigated and encouraged Wagner's search by asking her for information about Bass's delivery route, having repeated contacts with her to keep her updated on the outcome of police surveillance of Bass, and then not discouraging Wagner when she volunteered to look for items Bass may have discarded.

Detective Bowhay did ask Wagner for Bass's delivery route. But as Wagner testified, the route is public knowledge. "[Y]ou can sit on a street corner and you can see the same person drive by the same time every day." A reasonable trial

court could find a material difference between asking a private citizen to disclose publicly available information and asking that same person to search garbage bins for discarded items potentially containing a suspect's DNA.

With regard to the argument that repeated contacts with law enforcement transformed Wagner into a state agent, Wagner testified she had "very few" contacts with the police over a period of two years and estimated that she talked to them "[l]ess than ten" or "[m]aybe less than five" times. "[T]he mere fact that there are contacts between the private person and police does not make that person an agent." Walter, 66 Wn. App. at 866. A reasonable trial court could find that the number of contacts Wagner had with Detective Bowhay, over a period of two years, was insufficient to make her an agent of law enforcement.

Finally, Detective Bowhay conceded he did not discourage Wagner from looking for items Bass might discard at work. But as Bass admitted at the suppression hearing, "the State has no requirement to dissuade" a private citizen from searching for evidence. On appeal, Bass asks this court to deem Detective Bowhay's failure to dissuade Wagner as the equivalent of implied encouragement because "law enforcement could encourage private citizens to conduct illegal searches so long as they uttered the words, 'I cannot tell you to do that.'" But the trial court rejected Bass's argument that Detective Bowhay, through his conduct and words, made it clear to Wagner that he needed her help to find Bass's DNA. And Wagner testified she was acting on her own. The trial court clearly found this testimony credible, and we will not review on appeal the trial court's credibility

determinations. See In re Pers. Restraint of Davis, 152 Wn.2d 647, 680, 101 P.3d 1 (2004) (trial court's credibility determinations cannot be reviewed on appeal).

Bass insists that "Wagner would never have been involved in the investigation or known the police wanted Bass's DNA except for the fact that Detective Bowhay sought her out." Even if true, Bass cites no authority for the proposition that a police officer, by merely sharing information with a private citizen about an ongoing investigation, "recruited" that person into helping with the investigation. And it is contrary to the trial court's finding that Detective Bowhay did not "direct" Wagner to take any items discarded by Bass.

Substantial evidence supports the trial court's finding that Detective Bowhay did not direct, entice, or control Wagner and Wagner was not acting as a state agent when she retrieved Bass's cup and soda can from the workplace trash can.[4] These findings in turn support the legal conclusion that Wagner's seizure of Bass's discarded items and the DNA evidence was not the fruit of an unlawful search.[5]

---

[4] Although Bass challenges the trial court's finding that Wagner had an independent motivation for collecting Bass's DNA, we need not reach this issue. Because we uphold the finding that the police did not instigate, encourage, counsel, direct, or otherwise control Wagner, she cannot be a state agent, even if she acted with the sole intent to help law enforcement. See Ludvik, 40 Wn. App. at 263 ("a mere purpose to aid the government does not transform an otherwise private search into a government search").

[5] Bass alternatively argues that even if Wagner was not acting as a state agent when she gave his discarded soda can and cup to Detective Bowhay, Bass retained a privacy interest in his saliva, precluding the State from testing the saliva for DNA. But the Supreme Court rejected that argument in State v. Athan, 160 Wn.2d 354, 367, 158 P.3d 27 (2007) where it held that "there is no inherent privacy interest in saliva" when the collection of the bodily fluid does not involve an invasive or involuntary collection procedure. We are bound by this directly controlling precedent. See 1000 Virginia Ltd P'ship v. Vertecs Corp., 158 Wn.2d 566, 578, 146 P.3d 423 (2006) (a Washington Supreme Court decision is binding on all lower courts of this state).

B.  Sufficiency of the Evidence

Bass next argues the State failed to prove beyond a reasonable doubt that he raped or kidnapped Stavik, or that he caused her death in the course of either crime.  We conclude the direct and circumstantial evidence was sufficient to prove Bass committed these predicate offenses.

Due process requires that the State prove each element of a charged offense beyond a reasonable doubt.  State v. Chacon, 192 Wn.2d 545, 549, 431 P.3d 477 (2018).  We review de novo the sufficiency of the evidence.  State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).  Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.  State v. Elmi, 166 Wn.2d 209, 214, 207 P.3d 439 (2009).  A defendant's claim of insufficiency "admits the truth of the State's evidence and all inferences that reasonably can be drawn" from it.  State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Under RCW 9A.32.030(1), a person is guilty of murder in the first degree when

> (c) He or she commits or attempts to commit the crime of either . . . (2) rape in the first or second degree . . . or (5) kidnapping in the first or second degree, and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

A person is guilty of rape in the first degree when he engages in sexual intercourse with another person by forcible compulsion where he kidnaps the victim or inflicts serious physical injury.  Former RCW 9A.44.040 (1983).  "Forcible

- 16 -

compulsion" means "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped." Former RCW 9A.44.010(6) (1988).

Kidnapping in the first degree requires that the State prove the perpetrator intentionally abducted another person with the intent to facilitate the commission of any felony, including rape in the first degree, or flight thereafter. Former RCW 9A.40.020(1) (1975). To "abduct" is to "restrain a person by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use deadly force." Former RCW 9A.40.010(2) (1975). And to "restrain" is to "restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his liberty." Former RCW 9A.40.010(1).

Bass argues that while the evidence is sufficient to establish he had intercourse with Stavik, there is no evidence to establish that he raped or kidnapped her. This argument, however, fails to address the plethora of circumstantial evidence in the record. We consider circumstantial and direct evidence equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We also defer to the jury's evaluation of witness credibility, resolution of testimony in conflict, and weight and persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Viewing all evidence in favor of the State and drawing all reasonable inferences from that evidence, a jury could conclude that Bass kidnapped and raped Stavik. First, the circumstantial evidence supports the conclusion that

- 17 -

someone abducted Stavik against her will while she was on a run. Stavik was last seen alive at approximately 3:00 p.m., running near her house. Her body was found several miles away in the south fork of the Nooksack River adjacent to the homestead field. From this evidence, the jury could infer that she could not have gotten from Strand Road to the area where her body was found on foot and must have been conveyed there by car or truck.

This inference is consistent with the tracker's testimony that he found disturbed soil and footfalls on the side of Strand Road near where Stavik was last seen. Just before she went missing, Stavik's brother, Lee, saw her run past his friend's house on Strand Road, heading east toward their home. Allen Pratt found signs of disturbed soil and footfalls between Lee's friend's house and Stavik's home. Her dog returned home covered in river silt similar to that found in a nearby ditch. It would be reasonable to infer from this evidence that someone stopped in a vehicle, wrestled Stavik into that vehicle, leaving the dog behind, and conveyed her to an isolated place, such as the homestead field, near the spot in the river where her body was later found.

The circumstantial evidence also supports the inference that Stavik did not consent to being transported away from her home. First, she had evening plans with her roommate. She was en route home to get ready for that planned outing. Second, her body was found naked and covered in scratches consistent with her running through the blackberry bushes. Stavik's running clothes were never found. As it is unusual for anyone, let alone a young woman, to remove and hide their clothes and then to run naked through blackberry bushes in the woods in

November, it would be reasonable to infer that Stavik had not voluntarily removed her clothing, that her clothes were taken by her captor, and that she sustained scratches while attempting to flee him. Putting this evidence together with the fact that Dr. Goldfogel found Bass's semen in Stavik's vagina, a reasonable juror could conclude that Bass was the perpetrator and that he committed the abduction for the purpose of facilitating a sexual assault.

Second, there was both direct and circumstantial evidence that Bass raped or attempted to rape Stavik. Bass admitted he had intercourse with Stavik while she was home for Thanksgiving. Dr. Goldfogel testified that intercourse had to have occurred within 12 hours of her death. He also testified that the contents of her stomach indicated she had eaten within 3 to 4 hours of her death. Eyewitnesses testified that Stavik ate lunch between 11:30 a.m. and 12:30 p.m. on the day she disappeared, and then left for a run sometime after 2:00 p.m. From this evidence, the jury could reasonably infer that Stavik died between 3:30 and 4:30 p.m. on Friday afternoon and the only opportunity Bass had to engage in intercourse with Stavik was in the hour or two immediately preceding her death.

Further, the jury could reasonably have rejected Bass's assertion that he and Stavik had a secret affair. None of the witnesses at trial, including her mother, neighbors, and friends, had ever seen her with Bass. The afternoon that she died, she planned to return from her run so that she and Yoko could go out with Bass's brother, Tom, and Brad Gorum. A reasonable jury could conclude from this evidence that it was unlikely that she met Bass to have consensual sex with him while out on a run and before going out on a date with someone else.

Bass argues there were no vaginal wounds to support the assertion that Stavik was the victim of a sexual assault. Dr. Goldfogel, however, testified that based on relevant literature and his own experience examining more than 100 sexual assault victims, "it is more common to not find external or internal injuries than to find such injuries." The lack of such wounds does not negate the State's other circumstantial evidence that Stavik was raped.

Bass likewise contends the evidence was insufficient to establish an abduction occurred because Stavik had no defensive wounds and no foreign DNA under her fingernails, and "there were no signs she had been strangled or bound in any way." But the absence of defensive wounds or the use of physical restraints does not mean Stavik was not held against her will. The evidence indicated Stavik was physically fit. She typically ran five miles every day, 365 days a year. Yet, Stavik was found far from her home, with marks consistent with having run naked through blackberry bushes immediately before drowning. Stavik suffered a blunt force trauma to her head that could have rendered Stavik unconscious.[6] Although the traumatic injury could have occurred after Stavik entered the river, the evidence could lead a reasonable juror to conclude that Bass had abducted her.

Bass suggested below that someone else abducted and raped Stavik. But the circumstantial evidence of the time of sexual intercourse places Bass with Stavik after her disappearance. Bass admitted to his brother that he was in the homestead field near where Stavik was found the same weekend that she died.

---

[6] Dr. Goldfogel was unable to conclusively determine whether she sustained the blunt force trauma before or after her death, but the jury could have reasonably concluded that it happened prior to her death.

And Gina, Bass's ex-wife, testified that she and Bass had seen Stavik run past the Bass residence from Bass's upstairs bedroom window. A reasonable jury could find that Bass, aware of Stavik's running routine, approached Stavik while she was out running, and then conveyed her against her will to an area near where she was found, such as the homestead field, and did so with the intent to have intercourse with her.

The jury was also presented with evidence of Bass's consciousness of guilt. Bass confessed to Tom that he had sex with Stavik. After the police took an interest in him, Bass pretended not to remember Stavik. He asked his mother if they could tell the police that Bass's deceased father had killed Stavik, or if she would say Bass was with her Christmas shopping on the day Stavik died.

Relying on State v. Vasquez, 178 Wn.2d 1, 7, 309 P.3d 318 (2013), Bass maintains that the evidence against him—particularly his later inculpatory statements—is equivocal and thus insufficient. But Vasquez addressed whether mere possession of a forged Social Security card was sufficient, by itself, to establish the defendant's intent to injure or defraud was required to convict the defendant of forgery under RCW 9A.60.020. Our Supreme Court held that the "mere possession of forged documents, without evidence of an intent to injure or defraud, cannot sustain a forgery conviction." Id. at 13.

The jury here was not asked to infer guilt from a single piece of equivocal evidence. The State had evidence of Bass's sexual attraction to Stavik, his absence from the family home at the time of her death, his admitted presence in the homestead field that weekend, and his concession to having had intercourse

with Stavik that weekend. The State had evidence this intercourse could have occurred only after she left for her run and in a two-hour window before she died. The State presented evidence, from the scratches on Stavik's naked body, strongly suggesting that she had not consented to this intercourse. We conclude there was sufficient evidence before the jury to convict Bass of felony murder based on the predicate offenses of rape or kidnapping.

C. Ex Post Facto and Due Process

Bass next contends his conviction under the 1990 version of the felony murder statute violated either the prohibition against the ex post facto laws or his right to due process.

Bass was charged and convicted for felony murder under the current version of RCW 9A.32.030(1)(c), which was amended in 1990, after the crime occurred. In 1989, former RCW 9A.32.030(1)(c) (1975) required prosecutors to prove that the defendant "commit[ted] or attempt[ed] to commit [a predicate crime] and[ ] in the course of and in furtherance of such crime or in immediate flight therefrom, he . . . cause[d] the death of a person." (Emphasis added). By contrast, the 1990 amendment to the statute requires the state to prove that a perpetrator "commit[ted] or attempt[ed] to commit [a predicate crime] and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she . . . cause[d] the death of a person." RCW 9A.32.030(1)(c) (emphasis added).

The ex post facto clauses of the United States and Washington Constitutions forbid the State from enacting any law that imposes punishment for an act that was not punishable when committed, or inflicts a greater punishment

than could have been imposed at the time the crime was committed. State v. Ward, 123 Wn.2d 488, 496, 869 P.2d 1062 (1994); U.S. CONST. art. I, § 10; WASH. CONST. art. I, § 23. A law violates the ex post facto clause if it (1) is substantive, rather than merely procedural, (2) is retrospective, applying to events that occurred before the law's enactment, and (3) disadvantages the person affected by it. Ward, 123 Wn.2d at 498. Whether a law violates the constitutional prohibition against ex post facto laws is a question we review de novo. City of Seattle v. Ludvigsen, 162 Wn.2d 660, 668, 174 P.3d 43 (2007). "A statute is presumed constitutional, and the party challenging it has the burden to prove beyond a reasonable doubt that the statute is unconstitutional." State v. Boyd, 1 Wn. App. 2d 501, 507, 408 P.3d 362 (2017).

"As a general rule, courts presume that statutes operate prospectively unless contrary legislative intent is express or implied." State v. Humphrey, 139 Wn.2d 53, 60, 983 P.2d 1118 (1999). RCW 10.01.040 requires courts to presume criminal statutes, or amendments to criminal statutes, apply prospectively only unless the legislature expressly states otherwise:

> Whenever any criminal or penal statute shall be amended or repealed, all offenses committed or penalties or forfeitures incurred while it was in force shall be punished or enforced as if it were in force, notwithstanding such amendment or repeal, unless a contrary intention is expressly declared in the amendatory or repealing act . . . .

There is nothing to indicate the legislature intended the 1990 amendment to RCW 9A.32.030(1)(c) to apply retrospectively to conduct antedating the statutory amendment. We thus conclude the legislature did not intend to apply the 1990 version of RCW 9A.32.030 to events that occurred before the law's enactment.

- 23 -

The Washington Supreme Court addressed a similar issue in State v. Aho, 137 Wn.2d 736, 975 P.2d 512 (1999). In that case, Aho was found guilty of child molestation under a statute that did not take effect until approximately a year and a half after he allegedly began engaging in the criminalized conduct. Id. at 739-40. On appeal, Aho argued that his conviction violated ex post facto prohibitions of the state and federal constitutions because the jury might have convicted him for acts occurring before the effective date of the criminal statute. Id. at 740. The Washington Supreme Court rejected the ex post facto argument, concluding that, because the legislature intended the law to apply to conduct occurring after its enactment, the statute did not apply retrospectively and application of the statute could not be attributed to legislative action. Id. at 742-43. The court held that "the ex post facto prohibition applies to the legislative branch, and thus judicial decisions which are applied retroactively may raise due process concerns, but do not fall within the ex post facto clause itself." Id. at 742 (citing Marks v. United States, 430 U.S. 188, 191, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977)). For this reason, Bass's ex post facto argument fails.

But Bass also raises a due process challenge. Both the Washington and the United States Constitutions mandate that no person may be deprived of life, liberty, or property without due process of law. U.S. CONST. amends. V, XIV, § 1; WASH. CONST. art. I, § 3. The due process clause requires fair notice of proscribed criminal conduct and standards to prevent arbitrary enforcement. City of Richland v. Michel, 89 Wn. App. 764, 770, 950 P.2d 10 (1998) (citing State v. Becker, 132 Wn.2d 54, 61, 935 P.2d 1321 (1997)). Generally, criminal statutes operate only

prospectively to give fair warning that a violation carries specific consequences. State v. Pillatos, 159 Wn.2d 459, 470, 150 P.3d 1130 (2007).

Bass was convicted for acts occurring on November 24, 1989, more than six months before the June 7, 1990 effective date of the amended RCW 9A.32.030. See LAWS OF 1990, ch. 200, § 1. Bass contends it violates due process to convict him under the 1990 version of RCW 9A.32.030, rather than the version in effect in 1989 at the time of Stavik's death.

Aho is instructive but not directly on point. The Aho court concluded Aho's convictions violated due process because the crime of child molestation did not exist until midway through the charging period alleged by the State. It was thus possible that Aho was convicted of child molestation based on acts occurring before the child molestation statute went into effect. 137 Wn.2d at 744. Unlike in Aho, there was a felony murder statute in existence before the legislature modified it in 1990. And the change was small—the legislature changed the language from "in the course of and in furtherance of" to "in the course of or in the furtherance of." The question is whether this change mattered. In analyzing Bass's due process claim, we draw analogies to ex post facto case law, just as the Supreme Court did in Aho, because the "underlying principles are similar." Id. at 742.

A retrospective change in the law violates the ex post facto provision of the constitution if the change alters the ingredients of the offense, the ultimate facts necessary to establish guilt, or the degree of proof necessary. State v. Edwards, 104 Wn.2d 63, 71, 701 P.2d 508 (1985). Under Aho, a retrospective application of a criminal law would violate due process under these same circumstances. If

the 1990 amendment altered the elements of the offense of felony murder, then it would violate Bass's due process rights to convict him under that statute.

We agree with Bass that the 1990 amendment did alter the elements of the offense. Under the law in effect in 1989, the State had to prove that a defendant caused a victim's death both in the course of and in furtherance of the commission of another felony. After 1990, the State only had to prove that a defendant caused a victim's death either in the course of or in furtherance of the commission of another felony.

The State contends there was no due process violation here because the same proof standard applied under the pre-1990 and 1990 versions of the felony murder statute. It bases this argument on the Supreme Court's interpretation of the language "in furtherance of" in the older version of the statute as articulated in State v. Leech, 114 Wn.2d 700, 790 P.2d 160 (1990), abrogated on other grounds by In re Pers. Restraint of Andress, 147 Wn.2d 602, 56 P.3d 981 (2002). In that case, the defendant was convicted of felony murder when a firefighter died while attempting to extinguish a fire the defendant intentionally started. The Court of Appeals reversed the conviction because there was no proof the defendant caused the firefighter's death "in furtherance of" the arson, which we defined narrowly as "acting to promote or advance" the arson. State v. Leech, 54 Wn. App. 597, 602, 775 P.2d 463 (1989). The Court of Appeals agreed that the firefighter's death was caused "'in the course of,' i.e., during, the fire." Id. at 601. In a footnote, we explicitly rejected the argument that the statute required only that the State prove "in the course of" or "in furtherance of." Id. at 601, n.1. It stated "[i]f the Legislature

- 26 -

did not intend to require the State to prove that the killing occurred both 'in the course of' and 'in furtherance of', then it is free to amend the statute accordingly." Id.

The Supreme Court adopted a much broader interpretation of "in furtherance of," defining it this way: "if the homicide [was] within the 'res gestae' of the felony, i.e., if there was a close proximity in terms of time and distance between the felony and the homicide." Leech, 114 Wn.2d at 706. But the Supreme Court did not hold that "in the course of" and "in the furtherance of" meant the same thing. The only issue presented was whether the firefighter's death occurred "in the furtherance of the arson." Id. at 704. The court did not disavow our comment that the "and" between the two phrases created two separate elements the State had to prove.

While the Supreme Court's broad interpretation of the "in furtherance of" language indicates that any death that occurs "in the course of" the commission of a felony inevitably also occurs "in furtherance of" that same felony, the converse is not necessarily true. The legislature appears to have recognized this problem with the statute because the legislative history to the 1990 amendment referred to the Court of Appeals decision in Leech when it changed the language from "and" to "or." S.B. REP. ON SUBSTITUTE S.B. 6467, 51st Leg., Reg. Sess. (Wash. 1990). We conclude the modification to the statute in 1990 was material and did change the elements of the crime. Because the 1990 amendment to the felony murder statute changed the elements of that crime and modified what the State had to prove to obtain the conviction, Bass's due process rights were violated.

- 27 -

Recognizing that there is a due process violation, we must address the effect of such error. Most constitutional errors do not require automatic reversal of a conviction and are subject to a harmless error analysis. State v. Banks, 149 Wn.2d 38, 43, 65 P.3d 1198 (2003). The due process violation that occurred here is subject to a constitutional harmless error analysis. See State v. Irby, 170 Wn.2d 874, 885-86, 246 P.3d 796 (2011) ("A violation of the due process right to be present [during trial] is subject to harmless error analysis"); State v. Brown, 147 Wn.2d 330, 344, 58 P.3d 889 (2002) (jury instructions that omit or misstate an element of a charged crime are subject to harmless error analysis). Under the constitutional harmless error standard, prejudice is presumed and the State bears the burden of proving it was harmless beyond a reasonable doubt. State v. Coristine, 177 Wn.2d 370, 380, 300 P.3d 400 (2013).

The State has met that burden here. Under Leech, the jury would have had to find that Bass caused Stavik's death "during" a rape, attempted rape, kidnapping, or attempted kidnapping. While the evidence supports a finding that Bass caused Stavik's death "in furtherance of" a rape or attempted rape because her death occurred close in time and location to the rape, it does not support a finding that Bass caused the death "during" the rape. This lack of evidence, however, does not matter in this case because the jury also found Bass committed kidnapping or attempted kidnapping and the evidence supports a finding that Bass caused Stavik's death "during" that crime. Kidnapping is a continuing course of conduct crime:

> Because "abduct" is defined as restraining in some manner and "restrain" is defined as restricting a person's movements in a way

that "substantially interferes with his or her liberty," it follows that a crime of kidnapping continues so long as the victim's liberty is substantially interfered with. The use of the phrases "restrict a person's movements" and "in a manner which interferes substantially with his or her liberty" contemplates a continued state of being abducted until a person's liberty is no longer substantially interfered with.

State v. Classen, 4 Wn. App. 2d 520, 532, 422 P.3d 489 (2018). The crime of kidnapping thus continues until the person abducted reaches safety.

The evidence places Bass with Stavik during the last hour of her life, at a time when she ran naked through blackberry bushes near the river where she drowned. The only reasonable inference the jury could draw from this evidence is that Stavik died after being raped by but while fleeing Bass. The evidence supports no other reasonable inference. Stavik died fleeing her captor, and her death thus occurred "during" her kidnapping.

Because Bass caused Stavik's death during the commission of one of the predicate felony offenses, i.e., the kidnapping, her death also occurred in "close proximity in terms of time and distance" to that kidnapping. Thus, the State has demonstrated beyond a reasonable doubt that the jury would have found Bass caused Stavik's death both in the course of and in the furtherance of her kidnapping. Any error in convicting Bass under the 1990 version of felony murder was harmless error.

D. Ineffective Assistance of Counsel

Bass argues he received ineffective assistance of counsel when his trial attorneys failed to object to Dr. Goldfogel's testimony in which he recounted opinions formed by other, out-of-court experts, and failed to object to statements

- 29 -

made by his brother, Tom, and his ex-wife, Gina Malone. We reject both arguments.

The Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to effective assistance of counsel. State v. Estes, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail on an effective assistance of counsel claim, the defendant must show that (1) defense counsel's representation was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (applying Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

The decision whether and when to object to trial testimony is a "classic example[ ] of trial tactics." State v. Crow, 8 Wn. App. 2d 480, 508, 438 P.3d 541, *review denied*, 193 Wn.2d 1038 (2019). A reviewing court presumes that a "failure to object was the product of legitimate trial strategy or tactics." State v. Johnston, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). To rebut this presumption, "the defendant bears the burden of establishing the absence of any 'conceivable legitimate tactic explaining counsel's performance.' " State v. Grier, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011) (emphasis omitted) (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). Prejudice exists if "'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" Estes, 188 Wn.2d at 458 (quoting State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)).

Statements of Nontestifying Experts

Dr. Goldfogel testified that, as part of Stavik's autopsy, he collected a number of routine samples from different areas of her body. Dr. Goldfogel explained that fluids he collected were smeared on glass microscope slides, which he turned over to a cytotechnologist to stain. This cytotechnologist and a microbiology technologist examined the stained slides for the presence of sperm before returning them to Dr. Goldfogel. Dr. Goldfogel explained:

> The cytotech stains them, evaluates them, interprets them, and then turns it over for me to do it. I did it and then I had Dr. Gibb, who was still working in the lab, a more than 30-year experienced medical director and pathologist, independently look at them and we all agreed that there were very many sperm on the vaginal slide . . . . All of us independently looked at it. All of us agreed.

Defense counsel did not object to this testimony.

Bass contends his attorneys should have objected to Dr. Goldfogel's statement that two independent experts agreed with his conclusions regarding the number of sperm found in the swab. Bass argues this evidence both was inadmissible hearsay and violated his right to confront out-of-court expert witnesses who effectively testified against him.

Bass is correct that Dr. Goldfogel's testimony included hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801(c). Hearsay is inadmissible unless an exception or exclusion applies. ER 802. "Generally, one expert may not relay the opinion of another nontestifying expert without running afoul of the hearsay rule." State v. Brown, 145 Wn. App. 62, 73, 184 P.3d 1284 (2008).

However, Bass has not overcome the presumption that defense counsel had a legitimate, tactical reason for not raising a hearsay objection. First, under ER 703, experts may base their opinion testimony on facts and data that is not admissible in evidence if of a type reasonably relied on by experts in a particular field in forming opinions. State v. Lui, 153 Wn. App. 304, 321, 221 P.3d 948 (2009). ER 705 gives the trial court discretion to permit an expert to relate hearsay or otherwise inadmissible evidence to the jury for the limited purpose of explaining the reasons for that expert's opinion. Id. Had counsel objected to Dr. Goldfogel's testimony about the input he received from his forensic team, it is highly probable the court would have overruled that objection and provided a limiting instruction, had Bass requested one.

Second, the defense team may have chosen not to object because their forensic expert also testified that she relied on other experts in forming opinions that differed from those of Dr. Goldfogel. In disagreeing with Dr. Goldfogel's assessment of the slides, defense expert Dr. Johnson testified that both a senior criminalist with 20 years of lab experience and the owner of the lab reviewed the slides she was given to evaluate, and they agreed with her conclusions that the number of visible sperm was much lower than that counted by Dr. Goldfogel. Bass's attorneys bolstered their expert's opinions through this same strategy.

It is conceivable that defense counsel chose not to object on Sixth Amendment grounds for similar reasons. A person accused of a criminal offense has the right to confront the witnesses against him. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. The confrontation clause bars admission of testimonial

statements by a witness who does not appear at trial unless the witness is unable to testify and the accused had a prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Under well-established case law, an expert who provides opinion testimony partially based on the work of others does not violate a defendant's confrontation rights as long as the testifying expert's opinions are independently derived from their own significant expertise and analysis. Lui, 153 Wn. App. at 325. It is conceivable defense counsel strategically chose not to object on Sixth Amendment grounds because they knew Dr. Goldfogel's opinions were independently formed and based on his own analysis and expertise. It is not deficient performance to decide not to object to testimony when counsel reasonably believes the objection would be overruled. See In re Davis, 152 Wn.2d at 714 (When a defendant bases his ineffective assistance of counsel claim on trial counsel's failure to object, the defendant must show the trial court would have sustained the objection.). Counsel was not ineffective for failing to object to Dr. Goldfogel's testimony.

Statements by Tom and Gina

Next, Bass contends he received ineffective assistance of counsel when his trial attorneys failed to object to testimony that Bass maintains invaded the province of the jury and denied his constitutional right to a jury trial.

The right to have factual questions decided by the jury is crucial to the right to a jury trial. U.S. CONST. amend. VI; WASH. CONST. art. I, §§ 21, 22. No witness, lay or expert, "may testify to his opinion as to the guilt of a defendant, whether by direct statement or inference." State v. Black, 109 Wn.2d 336, 348, 745 P.2d 12

(1987). "[E]xpressions of personal belief, as to the guilt of the defendant, the intent of the accused, or the veracity of witnesses," are clearly inappropriate for opinion testimony in criminal trials. State v. Montgomery, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). Such testimony may constitute reversible error because it "violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury." State v. Quaale, 182 Wn.2d 191, 199, 340 P.3d 213 (2014). A trial court's ruling on the admissibility of opinion evidence is reviewed for abuse of discretion. State v. Demery, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001) (plurality opinion).

Bass points to two statements, one by his brother, Tom, and another by his ex-wife, Gina, that he argues were implicit opinion testimony as to Bass's guilt. First, Tom testified that when he and their mother visited Bass in jail, Bass asked them to provide him with a fabricated alibi. Immediately after leaving the jail, Tom expressed concerns to his mother that Bass would ask them to lie for him. The prosecutor asked if that "cause[d] a break in [Tom's] relationship with [Bass]," to which Tom replied that this incident "was the start of it" and indicated that he stopped visiting his brother shortly thereafter. Defense counsel did not object.[7] Second, Gina testified that she and Bass had been married for 28 years before divorcing in March 2019. Again, defense counsel did not object to this testimony.

Bass argues that both witnesses' testimony constituted improper opinion testimony because they served the purpose only of demonstrating that Tom and

---

[7] While defense counsel did not object to the specific testimony identified here, defense counsel moved to prohibit Tom from testifying about his subjective belief in Bass's guilt before Tom's testimony began. The trial court granted this motion.

Gina believed Bass to be guilty. Bass relies on State v. Johnson, 152 Wn. App. 924, 219 P.3d 958 (2009) to support this proposition. In Johnson, the defendant was being tried for child molestation. At trial, the prosecution repeatedly elicited testimony about how Johnson's wife, when confronted with proof of the accusations against her husband, broke down into tears and acknowledged that it must be true. Id. at 932-33. The appellate court reversed his conviction, concluding the wife's opinion as to the veracity of the child victim's version of events served no purpose beyond prejudicing the jury.

Johnson is distinguishable from this case. Johnson involved repeated, explicit testimony that the wife believed her husband to be guilty. Here, the jury heard only that the relationships Bass had enjoyed with his brother and ex-wife deteriorated following his arrest and the jury heard each statement only once. Neither testified that the relationships ended because they believed him to be guilty, and the inference that Bass's family members believed Bass to be guilty is speculative at best. The more reasonable inference from Tom's testimony is that the brothers became estranged because Bass asked Tom and their mother to lie to law enforcement. And it is just as reasonable for the jury to infer from Gina's testimony that she divorced Bass because she learned he had had sexual relations with Stavik while the two were engaged to be married as to infer she believed him guilty of Stavik's murder. Neither of the challenged statements was an impermissible opinion on Bass's guilt. As a result, defense counsel was not ineffective for failing to object to the testimony.

E.  Right To Present a Defense

Bass next challenges the trial court's exclusion of Stavik's diary.  He argues the diary showed Stavik's state of mind in the year preceding her death, which, he contends, suggests she was suicidal.  By excluding the diary, Bass maintains, the trial court denied him the ability to argue Stavik died by suicide, rather than by homicide.  We reject this argument.

We review constitutional challenges to evidentiary rulings utilizing a two-step process.  State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019); State v. Clark, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017).  First, we review a trial court's evidentiary rulings for an abuse of discretion.  We defer to the trial court's evidentiary rulings unless " 'no reasonable person would take the view adopted by the trial court.' "  Clark, 187 Wn.2d at 648 (internal quotation marks omitted) (quoting State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)).  Second, we determine whether such rulings violated a defendant's rights under the Sixth Amendment de novo.  Id. at 648-49.  "If the court excluded relevant defense evidence, we determine as a matter of law whether the exclusion violated the constitutional right to present a defense."  Id.

The United States Constitution and the Washington State Constitution guarantee defendants the right to present a defense.  U.S. CONST. amend. VI, XIV; WASH. CONST. art. I, § 3; State v. Wittenbarger, 124 Wn.2d 467, 474, 880 P.2d 517 (1994).  This right is basic but not absolute.  State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010).  Defendants have no constitutional right to present irrelevant evidence.  Id.

ER 402 provides that evidence that is not relevant is not admissible. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. The proponent of the evidence bears the burden of establishing its relevance and materiality. State v. Pacheco, 107 Wn.2d 59, 67, 726 P.2d 981 (1986); State v. Bedada, 13 Wn. App. 2d 185, 193, 463 P.3d 125 (2020). A trial court properly excludes evidence that is "remote, vague, speculative, or argumentative because otherwise 'all manner of argumentative and speculative evidence will be adduced,' greatly confusing the issue and delaying the trial." State v. Kilgore, 107 Wn. App. 160, 185, 26 P.3d 308 (2001) (quoting State v. Jones, 67 Wn.2d 506, 512, 408 P.2d 247 (1965)).

Bass sought to admit entries from Stavik's diary to establish her state of mind under ER 803(a)(3). He argues that because Dr. Goldfogel was unable to conclude Stavik's death was the result of a homicide, these diary entries are direct or circumstantial evidence of an alternative manner of death—suicide.

In the diary, Stavik wrote about her relationships with others, including friends whom she deeply admired, some with whom she quarreled, her mother, and her boyfriend. She expressed concerns about her weight, her caffeine consumption, her sleeping habits, and her future. There are only three diary entries that arguably support Bass's contention that Stavik experienced suicidal thoughts at some point during the last year of her life. On March 17, 1989, she wrote in her diary that she thought about suicide. On April 2, 1989, she again

wrote that she was depressed and hated life. And sometime shortly after June 23, 1989, she questioned whether life was worthwhile.

The trial court reviewed the last 18 pages of the diary, which includes approximately 28 entries from the last year of Stavik's life. The trial court made extensive written findings describing the content of each entry and addressing their admissibility. It concluded that 19 entries were irrelevant because they did not demonstrate or convey "a state of mind indicative of depression or suicidality." The court indicated several other entries "might be relevant," but concluded they were inadmissible because they rested on theories that were speculative and lacked an adequate foundation.

The trial court described the three entries describing thoughts of hopelessness as "significant" but ultimately determined they were inadmissible because "the theory that she was depressed and that her depression equates to either attempted suicide, or suicide itself, lacks sufficient foundation and is speculative." The court concluded:

> Whether viewed individually or in the aggregate, the diary entries paint a picture of a young woman who was anxious about her appearance and her relationships, a typical condition for young people often described as "teen angst." While certain entries may be evidence that she was clinically depressed or suicidal, such a conclusion does not naturally or necessarily flow from her statements absent some other supporting factor or factors, the significant danger being that, without sufficient foundation, the diary and its entries would be confusing or misleading to the jury.

The trial court's relevance rulings are not an abuse of discretion. To be admissible under ER 803(a)(3), there are "two relevances" that must coexist. United States v. Brown, 160 U.S. App. D.C. 190, 490 F.2d 758, 774 (1973). First,

the victim's state of mind must be relevant to some material issue in the case, such as whether the victim died by suicide. Id. Second, the extrajudicial statement itself must be probative on the question of the victim's purported state of mind. Id. Certainly, whether Stavik's death was a homicide or a suicide was relevant to a material issue in this felony murder case. But the trial court did not err in concluding the entries were not probative of a suicidal state of mind.

First, a reasonable judge could conclude that the diary entries in which Stavik discussed her feelings about her friends, family members, weight and physical fitness, and possible career choices might provide a glimpse into Stavik's state of mind on the days of the entries, but none tended to prove, either directly or circumstantially, that she was suicidal, either at the time she wrote the entries or in November 1989 when she died.

Second, a reasonable judge could also conclude that the entries explicitly expressing feelings of depression or suicidality were too remote in time to bear on Stavik's state of mind in late November 1989. See State v. Johnson, 61 Wn. App. 235, 242, 809 P.2d 764 (1991) (statement made one day after crime inadmissible because not probative of defendant's state of mind on day of crime where no evidence indicated she had same state of mind on earlier date). Between the last June 1989 entry in which Stavik recounted feelings of depression and her November 1989 death, she wrote with great enthusiasm about college life, upcoming travel, get-togethers with friends, and family events. In addition, none of the entries ever discuss a plan or intent to act on any feelings of suicidality.

Evaluating the speculative nature of Stavik's diary entries is not unlike evaluating the speculative nature of "other suspect" evidence. When a defendant seeks to offer evidence that someone else actually perpetrated the crime for which that defendant is charged, the defendant must show "some combination of facts or circumstances [that] point to a nonspeculative link between the other suspect and the charged crime." State v. Franklin, 180 Wn.2d 371, 381, 325 P.3d 159 (2014). If the other suspect evidence is speculative or merely raises a suspicion, it is properly excluded as irrelevant. Id. at 379.

In this case, Bass has not demonstrated a combination of facts or circumstances pointing to a nonspeculative link between Stavik's diary entries and the manner of her death on November 24, 1989. The only evidence on which Bass relied for the proposition that Stavik died by suicide was the diary entries and the fact that her death could not conclusively be ruled a homicide.[8] Because the link was too speculative, the trial court correctly concluded the diary entries were irrelevant.

Because Bass has no right to present irrelevant evidence, the trial court did not violate his right to present a defense by excluding Stavik's diary.

F. Judicial Comment During Voir Dire

Bass contends the trial court impermissibly commented on the evidence when it stated, in response to a prospective juror's question, that witnesses called to testify at trial have testimony that is relevant. We disagree.

---

[8] Dr. Goldfogel testified that he could not conclusively conclude Stavik's manner of death was a homicide, an accident, a suicide, or a result of natural causes and he therefore ruled the manner of death was "undetermined."

- 40 -

Article IV, section 16 of the Washington Constitution provides that "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." This constitutional provision prohibits a judge "from 'conveying to the jury his or her personal attitudes toward the merits of the case' or instructing a jury that 'matters of fact have been established as a matter of law.'" State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006) (quoting State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997)).

We apply a two-step analysis to determine if a judicial comment requires reversal of a conviction. Id. First, we examine the facts and circumstances of the case to determine whether a court's conduct or remark rises to a comment on the evidence. State v. Sivins, 138 Wn. App. 52, 58, 155 P.3d 982 (2007). "It is sufficient if a judge's personal feelings about a case are merely implied." Id. If we conclude the court made an improper comment on the evidence, we presume the comment is prejudicial, "and the burden is on the State to show that the defendant was not prejudiced, unless the record affirmatively shows that no prejudice could have resulted." Levy, 156 Wn.2d at 723.

During voir dire, one potential juror asked the court "Can anybody just be a witness? What are the requirements to be a witness?" The court explained to the venire panel:

> The answer to the question is a person can be a witness if they have testimony that's relevant, um, that's sort of the basic rubric for whether or not a person can testify. If they don't have testimony that's relevant, then there would be an objection from one of the parties and it would be up to the court to determine whether the person could testify at all or whether the person can testify about a particular thing.

The court asked counsel if they felt it had misstated anything. Neither counsel objected. When the juror asked further about "professional witnesses," the court said:

> The parties have a right and indeed an obligation to set forth relevant evidence. The burden is on the State, the defense doesn't have any obligation to provide evidence. If the parties prior to any proceeding . . . thought that there was a reason that someone being called as a witness just as a matter of, that was obvious didn't think that person should testify, then they could bring that matter before the court on what's called a pretrial motion, that's not something that a jury would ever see. What the jury may see is objection to testimony in court and it's up to the attorneys to make properly made objections and it's up to the court to decide whether or not a person can testify either at all or in a particular area.

According to Bass, these comments suggested to the jury that "the judge deemed relevant everything a testifying witness had to say" and that Bass's failure to object to testimony meant the testimony must be relevant to his guilt.

We cannot agree. The court's statement that it would determine whether a witness had relevant information does not amount to a judicial comment on the evidence. The statement did not reveal the court's "attitudes toward the merits of the case" or reflect the court's personal opinion of any disputed issue before it. Id. at 721; see Sivins, 138 Wn. App. at 58. The comments were nothing more than an explanation of ER 402 as applied to witness testimony. Even if such comment were to amount to an improper comment on the evidence, no prejudice could have resulted from it. The statement that witnesses have relevant information is neutral and applies equally to both prosecution and defense witnesses. There was no improper comment on the evidence.

G. Cumulative Error

Finally, Bass argues that the cumulative effect of the challenged errors bolstered the prosecution's case while undermining his defense and thus requires reversal. The cumulative error doctrine requires reversal when the combined effect of several errors denies the defendant a fair trial. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." Id. Bass has identified only one error, which we determined was harmless. Because Bass cannot show multiple errors affected the outcome of his trial, his cumulative error claim fails.

We affirm.

_Andrus, A.C.J._

WE CONCUR:

_____        _Appelwick, J._