# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. WILLIAM WALTER LATTIN, Appellant. | DIVISION ONE No. 86625-7-I UNPUBLISHED OPINION |

DWYER, J. — William Lattin appeals from the judgment and sentence entered as a result of his convictions of rape of a child in the first degree and child molestation in the first degree. He contends that the trial court erred when it ruled that he was ineligible for a special sex offender sentencing alternative (SSOSA). See RCW 9.94A.670. Lattin also contends that he was deprived of due process and a fair trial because the court referred to a video of a child forensic interview, entered into evidence, as "testimony," thus, Lattin continues, improperly commenting on the evidence. Lattin finally asserts that his attorney provided ineffective assistance of counsel by not objecting to the court's denial of the SSOSA and for not moving for a mistrial after the trial court's purported comment on the evidence.

We conclude that Lattin fails to show that the trial court erred by denying the SSOSA request. Moreover, Lattin is incorrect that the court's use of the word

"testimony" to describe the recorded interview constituted a comment on the evidence. Therefore, it follows that Lattin was not prejudiced by his counsel's performance on the grounds advanced. Accordingly, we affirm.

I

In July of 2021, G.B. and her parents, mother Kristi and father Terry,[1] traveled from Las Vegas, Nevada to Port Angeles, Washington, to visit with Kristi's mother, Barbara Lattin, and Barbara's husband, William Lattin. G.B. was seven years old at the time. On July 9, 2021, the family hosted a barbecue with friends. By approximately 7:00 p.m. the guests had left the house. Lattin was drinking red wine and was sitting outside with other family members. G.B. took her mother's cell phone and went inside to talk with her cousin on Facetime in a spare bedroom. At some point thereafter, Lattin also went inside.

Lattin entered the spare bedroom where G.B. was laying on the bed and talking with her cousin. In the bedroom, Lattin started to play and wrestle with G.B. At one point, he touched G.B. on her vagina on the outside of her clothing. He then pulled her pants and underwear down to her thighs and put his finger inside of her vagina. G.B. told Lattin, "stop, it's not funny, stop." G.B. told him to stop about five times. Lattin responded, "[w]hy, it's fun." G.B. tried to pull up her pants up a couple of times, but Lattin pulled them down again.[2] Lattin's wife, Barbara, walked into the house and called out to him from the living room, asking

---

[1] We refer to the parents by their first names to further obscure G.B.'s identity.
[2] During this incident, the Facetime call with G.B.'s cousin ended, although the record is not clear about exactly when the call was terminated or by whom. G.B.'s cousin was not called as a witness during the trial.

Lattin if he was okay. Lattin answered, "I'm a little drunk." Barbara did not come into the bedroom. Lattin then stopped touching G.B. and left the bedroom.

Shortly thereafter, G.B.'s mother, Kristi, who had been sitting outside, entered the house to check on G.B. and found her in the bedroom with Barbara. G.B. was crying and visibly upset. G.B. told her mother what Lattin had done to her: that he had pulled her pants down and put his finger inside her "hole." G.B. told her mother that her vagina was burning and that it hurt. Soon thereafter, they left the Lattin house to stay overnight in a motorhome parked alongside the house. Once inside, G.B. and Kristi told Terry what Lattin had done to G.B.

The next morning, on July 10, 2021, Terry confronted Lattin about his actions. Lattin replied that he had drunk three bottles of wine the day before, had been intoxicated, and did not remember what had happened. Lattin told Terry that he had been tickling G.B. and that "she's always coming to play with me like that."

Kristi, Terry, and G.B. then left the house and drove to a police station. Deputy James Dixon of the Clallam County Sheriff's Office conducted a child forensic interview with G.B. G.B. told Deputy Dixon about the incident on July 9. She also told Deputy Dixon that Lattin had twice touched her vagina over her clothing on July 7, also during the family's visit. The interview with G.B. lasted over one hour and was video recorded.[3]

After leaving the police station, Kristi and Terry took G.B. directly to the hospital, where a SANE nurse (sexual assault nurse examiner) examined her.

---

[3] The recording was later admitted as evidence at trial and played for the jury.

The nurse, Natalie Evenson, testified at trial that she noted redness on G.B.'s labia that was not completely normal.

On July 20, 2021, Lattin was arrested and charged with one count of rape of a child in the first degree and two counts of child molestation in the first degree. The charges included the July 9 incident as well as the incidents on July 7.[4]

A jury trial commenced on September 28, 2022. During the trial, the hour-long video recording of Deputy Dixon's child forensic interview with G.B. was played for the jury. G.B. also testified to the same sequence of events that she had described in the forensic interview and her testimony elucidated facts that were consistent with her description of events in the previously recorded interview.

After the conclusions of testimony, the trial court instructed the jury. Regarding the viewing of exhibits during jury deliberations, it instructed:

> Exhibits may have been marked by the court clerk and given a number, but they do not go with you to the jury room during your deliberations unless they have been admitted into evidence. The exhibits that have been admitted will be available to you in the jury room.

See CrR 6.15(e).[5] Regarding the review of testimony during jury deliberations, the court instructed:

> You are the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness. In assessing credibility, you must avoid

---

[4] Count 3 was later dismissed by the State after the jury returned from its deliberations and was deadlocked on its verdict.

[5] CrR 9.15 pertains to Instructions and Argument. CrR 6.15(e) provides: "**Deliberation.** After argument, the jury shall retire to consider the verdict. The jury shall take with it the instructions given, all exhibits received in evidence and a verdict form or forms."

bias, conscious or unconscious, including bias based on religion, ethnicity, race, sexual orientation, gender or disability.

And further:

You will need to rely on your notes and memory as to the testimony presented in this case. Testimony will rarely, if ever, be repeated for you during your deliberations.

Regarding the judge's utterances during the trial, the court instructed:

Our State Constitution prohibits a trial judge from making a comment on the evidence. It would be improper for me to express by words or conduct my personal opinion about the value of testimony or other evidence. I have not intentionally done this. If it appeared to you that I have indicated my personal opinion in any way either during trial or in giving these Instructions, you must disregard this entirely.

During its deliberations, the jury requested to see the USB drives with video recordings. The jury did not specify which recording they wanted to view, the house surveillance footage or the forensic interview, both of which were on USB drives. The trial judge discussed the appropriateness of the jury request with the attorneys and said:

THE COURT: Well, my thought was -- here's the answer I thought I was going to give, you may watch the videos taken at the house. The video of [G.B.]'s interview of Deputy Dixon [sic] is considered testimony and not available during deliberations. See jury instruction indicating testimony will rarely, if ever, be replayed for you.

The trial judge also referred to the recording of G.B.'s interview as admitted "evidence." All agreed.

THE COURT: So, what we're talking about, we have two different things. We have videos taken at the house where this incident took place --
[STATE]: Right, with the timeline --
THE COURT: Yeah, this is --
[STATE]: Right.

5

> THE COURT: -- videos. But we also have the child's interview with Deputy Dixon. That's been admitted into evidence. They played it during the -- it was played during the trial.
>
> . . . .
>
> [STATE]: I, you know. Obviously, I think the Court has a wide amount of discretion about the subject of will recorded statements be -- be played to the jury. There's case law addressing that. I don't think there's any case law that says a child forensic interview, as an exhibit, since it is admitted, and they -- they have it in evidence --
>
> THE COURT: Yeah, they do.
>
> [STATE]: -- that it can't be played. . . .
>
> THE COURT: Yeah.
>
> . . . .
>
> THE COURT: So, [Defense Counsel], what do you think of my response?
>
> DEFENSE COUNSEL: I think it's correct.

The trial court initially denied the jury's request to again view the video of G.B.'s forensic interview.

The following day, the jury sent a second note to the court, asking why the forensic interview was considered testimony and could not be viewed, considering that the forensic interview thumb drive had been entered into evidence and had been included in the jury's evidence basket the previous night. The jury inquiry continued:

> We understand we cannot get a print out report of the interview, but this thumb drive was entered in as evidence and we really feel as though we should be able to review this.

The trial judge and parties then discussed the jury's second note. The attorneys referred the court to State v. Elmore,139 Wn.2d 250, 295, 985 P.2d 289 (1999). In Elmore, the State had admitted nontestimonial recordings as

6

evidence. The recordings were provided to the jury during deliberations and the jury was permitted to play a recording of the defendant's statement.[6]

Defense counsel expressed concern that the child forensic interview with G.B. was different from an adult defendant's statement, as in Elmore, because it could invoke an emotional response rather than a rational one. Defense counsel argued that the recording was of an alleged child victim's statement during which "a very charming and cute young girl" was describing what had happened and that this "would engender all kinds of prejudice."[7]

The trial court ultimately decided to allow the jury to play the recording of G.B.'s interview once, under the supervision of the bailiff.

On October 5, 2022, the jury found Lattin guilty of counts 1 and 2 (rape of a child and child molestation occurring in the bedroom on July 9, 2021), but they were deadlocked on a verdict for count 3 (child molestation for touching G.B.'s vagina over her clothes on July 7, 2021). The trial court declared a mistrial with regard to count 3. The State subsequently moved to dismiss count 3 and the trial court granted the dismissal.

The Department of Corrections conducted a presentence investigation (PSI) in November 2022. In it, the child forensic interview with G.B. and several family impact letters submitted by G.B.'s family were considered. The PSI report

---

[6] Elmore held that ""'such exhibits [may] go to the jury if, in the sound discretion of the trial court, the exhibits are found to bear directly on the charge and are not unduly prejudicial.'"" 139 Wn.2d at 295 (alteration in original) (quoting State v. Castellanos, 132 Wn.2d 94, 98, 935 P.2d 1353 (1997)) (quoting State v. Frazier, 99 Wn.2d 180, 189, 661 P.2d 126 (1983)).

[7] To counter the defense argument, the State referred to an unpublished case, State v. Acosta, noted at 158 Wn. App. 1048 (2010), in which a trial court allowed the jury to review the recording of a child forensic interview. Acosta held that the trial court properly admitted the videotape in a manner that did not overly emphasize the evidence because it limited use and controlled the playback to the jury to one time.

included a risk/needs assessment and a summary of community concerns. The

risk assessment stated that neither Lattin nor his attorney had been in contact to

schedule an interview for the PSI and, as a result, an interview with Lattin was

not conducted or included in the report. The PSI's summary of community

concerns stated:

> I am aware of no instance in which Mr. Lattin has taken
> responsibility for his actions or expressed remorse. He abused a
> position of trust he held as a child's grandfather and molested her.
> When confronted with his behavior by members of his family he
> stated he didn't know what happened because he was
> drinking. . . . These factors combine to raise concerns about future
> offenses.

The PSI's conclusions stated:

> Before the court is a[n] 83 year old man who has been found guilty
> during a trial of Rape of a Child 1 and Child Molestation 1. Due to
> the nature of the offense and the factors listed above I believe a
> sentence of confinement with[in] the standard range appears to be
> appropriate.

Before sentencing, Lattin was interviewed by Dr. Tait Gray, who

conducted a psychosexual evaluation. Dr. Gray concluded that, based on his

testing and evaluation, Lattin had a low risk of recidivism, would be amenable to

treatment, and was thus a candidate for the SSOSA program. Dr. Gray

proposed a treatment plan consisting of three general phrases:

> (a) an initial phase during which he clarifies the full extent of his
> deviant sexual behavior and interest; (b) develop an inventory of
> dynamic risk issues, clarifying the progression of thoughts, feelings,
> and behaviors that could potentially contribute to re-offense, and (c)
> develop a long-term re-offense prevention plan for the future.

Dr. Gray's report continued:

> It will be important for Mr. Lattin to be honest about his deviant
> interest that contributed to the abuse. If Mr. Lattin does not

8

progress in that area, it may be determined that he is not amenable, but he again has voiced his willingness to participate and disclosed fully his thoughts and feelings that lead to his behaviors.

Dr. Gray's recommendations also included a restriction against contact with minors under the age of 18 without approval of his treating therapist or officer of the court, that he should not use sexually explicit materials of any kind, that he should think about getting a chaperone in high risk settings, and that he should abstain from consuming alcohol, among other restrictions.

At the sentencing hearing, Lattin requested that the trial court impose a 108-month sentence, suspended to 12 months on the condition that he undergo sex offender treatment consistent with the requirements of a SSOSA.

During the hearing, Lattin read a written apology to G.B. In his allocution, Lattin expressed regret for his actions and said that he took responsibility for his actions:

> MR. LATTIN: Good morning, Your Honor. I would like to take this opportunity to take responsibility for the crimes that I've committed and to apologize to my granddaughter [G.B.] -- or her mother and my stepdaughter Kristi -- for the hurt that I have caused them and the harm that I have brought to our entire family. I am truly sorry for what I've done. I hope in time that you might find it in your heart to forgive me for the wrongs that I have committed against you and our family. Thank you.

G.B.'s mother, Kristi, and aunt, Samantha, also gave statements during the hearing, describing the difficulties imposed on G.B. and their family as a result of Lattin's actions. G.B.'s aunt asked the court to impose the maximum sentence on Lattin.

9

Having heard these and other statements, the trial court denied Lattin's request for a SSOSA. The trial judge explained her decision, first noting that, until Lattin's apology at the sentencing hearing, Lattin had not given any indication of remorse. The trial judge also noted that Lattin's examination report did not contain his own version of the facts, rendering it statutorily deficient.

> There's no indication of your version of events in the PSI, and moreover there's no version of your events -- your version of facts and events in the SSOSA evaluation, which I think is a requirement of getting a SSOSA. I mean, I'm looking at RCW 9.94A.670. It says the report of the examination shall include at a minimum the following: the offender's version of facts and the official version of facts, and it doesn't have that. So, I think at the outset we have a problem. . . . I have here today a -- I guess somewhat of a[n] admission, but I guess that, to me, it all comes down to how do you solve a problem when the person doesn't admit he has a problem?

The trial judge said she had carefully thought about the issue, and concluded:

> But I'm not going to grant a SSOSA. I think -- I think I do have an issue that there's no version of events. The only thing we have here is a -- sort of an apology to [G.B.], and I just don't think that's enough.

The trial court also acknowledged that G.B. and her family opposed granting Lattin the SSOSA.

The trial judge explained that she was going to impose a period of incarceration at the low end of the standard range due to his letters of support and Dr. Gray's psychosexual evaluation, indicating that the incident appeared to be a one-time event. Lattin was sentenced to 93 months on count 1 (rape of a child) and 51 months on count 2 (child molestation) to run concurrently.

Lattin appeals.

II

Lattin first asserts that the court abused its discretion by denying the request for a SSOSA sentence. We disagree.

A

We review the denial of a request for a SSOSA sentence for an abuse of discretion. State v. Frazier, 84 Wn. App. 752, 753, 930 P.2d 345 (1997). The granting of a SSOSA is at the trial court's discretion, "as long as the court's decision does not rest on an impermissible basis." State v. Spaulding, 15 Wn. App. 2d 526, 532, 476 P.3d 205 (2020) (citing State v. Sims, 171 Wn.2d 436, 445, 256 P.3d 285 (2011)). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. State v. Hays, 55 Wn. App. 13, 16, 776 P.2d 718 (1989).

We review de novo whether a defendant is eligible for a SSOSA under RCW 9.94A.670(2)(a) as a matter of statutory interpretation. Spaulding, 15 Wn. App. 2d at 532; State v. Pratt, 11 Wn. App. 2d 450, 457, 454 P.3d 875 (2019).

B

A SSOSA allows a court to conditionally suspend the full sentence of a qualifying sexual offender in favor of the defendant undergoing treatment, serving a much shorter term of confinement, and serving the remaining sentence in community custody. RCW 9.94A.670(4), (5). To be eligible for a SSOSA, the defendant must have been convicted of a qualifying sex offense with a sentencing range that allows for confinement for less than 11 years. RCW 9.94A.670(2)(a), (f). The defendant must have had an established relationship

with the victim and the offense must not have resulted in substantial bodily harm to the victim. RCW 9.94A.670(2)(d), (e). The defendant also must not have any prior convictions for sex offenses or recent adult conviction for a violent offense. RCW 9.94A.670(2)(b), (c).

Examining the plain language of the statute suggests that the initial threshold for eligibility is meeting the first set of factors set forth above (qualifying sex offense, confinement under 11 years, established relationship or connection to victim, no substantial bodily harm). If a defendant is eligible for a SSOSA based on these preliminary factors, then the court "may order an examination to determine whether the offender is amenable to treatment." RCW 9.94A.670(3). The resulting examination report must contain, among other information, the offender's version of the facts, "[a]n assessment of problems in addition to alleged deviant behaviors," and an appraisal of the "offender's amenability to treatment and relative risk to the community." RCW 9.94A.670(3)(a)(iii), (b). After receiving the report, the court must then consider additional factors:

> [1] whether the offender and the community will benefit from use of this alternative, [2] consider whether the alternative is too lenient in light of the extent and circumstances of the offense, [3] consider whether the offender has victims in addition to the victim of the offense, [4] consider whether the offender is amenable to treatment, [5] consider the risk the offender would present to the community, to the victim, or to persons of similar age and circumstances as the victim, and [6] consider the victim's opinion whether the offender should receive a treatment disposition under this section.

RCW 9.94A.670(4); Spaulding, 15 Wn. App. 2d at 532.

The statute also provides that parents of a minor child victim are themselves victims for the purposes of RCW 9.94A.670. RCW 9.94A.670(1)(c).

The statute requires that the trial court enter written findings and state its reasons for the decision whether to grant a SSOSA only when the court imposes a SSOSA contrary to the victim's wishes. RCW 9.94A.670(4); Spaulding, 15 Wn. App. 2d at 532.

C

Here, Lattin was eligible for a SSOSA based on a qualifying sex offense crime with a sentence not exceeding 11 years. He had no prior convictions. Lattin had an established familial relationship with G.B. as her grandfather. G.B. did not suffer substantial injury as a result of the crime. A psychosexual evaluation of Lattin concluded that Lattin was amenable to treatment.

However, the presentencing investigation's summary of community concerns stated that Lattin had not given an interview to the investigator or provided his version of the events for the report. Lattin contends his "version of events" was that he had been too drunk to remember what had happened the evening of July 9, 2021. Lattin asserts that the trial court's "wish" for more detail was not required by the plain language of the statute.

We agree with the trial court that Lattin's argument is insufficient. Lattin merely provided an explanation or excuse for why he did not submit his version of the events. But his explanation did not provide an actual version of events as required by the statute. Lattin did not provide a factual account or make himself available for an interview. The PSI investigator and the court were correct to acknowledge this failure and to subsequently conclude that Lattin had not shown

13

remorse, was not amenable to treatment, and, as such, was a risk to the community.

Lattin cites to State v. Adamy, 151 Wn. App. 583, 587, 213 P.3d 627 (2009), in an attempt to support his argument. Adamy held that the trial court abused its discretion when it denied a SSOSA based on an erroneous conclusion that Adamy was not eligible due to his deportation status. However, Adamy does not influence our current decisions, because in that case the key issue was the interplay of an additional law regarding deportation status. No such issue is present here.

Here, the issue is whether all of the factors pertinent to the SSOSA request were meaningfully assessed in order to enable the court to fully and properly exercise its discretion. During the sentencing hearing, the State conceded that Lattin was "technically" eligible to receive a SSOSA, but that the facts and statutory factors to be considered by the court were weighed against him. We agree.

Spaulding illustrates the distinction between eligibility and entitlement. The Spaulding court determined that the trial judge erred by concluding that Spaulding was ineligible for a SSOSA because he did not have an established relationship with the victim. 15 Wn. App. 2d at 529. However, the court ultimately held that "even if Spaulding was *eligible* for a SSOSA, he had no *right* to a SSOSA." Spaulding, 15 Wn. App. 2d at 536 (emphasis added).

The record indicates that the trial court herein meaningfully considered both whether Lattin was eligible and whether a SSOSA sentence would be

appropriate for Lattin before denying his request. The court considered the evidence presented at trial, the memoranda and briefing, the PSI report, and the psychosexual evaluation. The court noted concerns regarding Lattin's lack of remorse and unlikely amenability to treatment, his risk to the community, that the SSOSA was too lenient given the circumstances, and that the victim's opinion was against granting Lattin a SSOSA. The trial court reasoned that, regardless of his initial statutory eligibility, he was still a poor candidate to receive a SSOSA.

The trial judge considered all of the statutory factors, which indicates a proper exercise of discretion. By considering the factors and the information provided and reaching a logical conclusion, the trial court did not abuse its discretion.

III

Lattin next contends that the trial court improperly commented on the evidence by referring to G.B.'s forensic interview as "testimony" rather than "evidence" when answering a jury request to review the video recording of the interview during its deliberations. This is so, according to Lattin, because the judge's use of the word "testimony" gave the evidence undue influence and a heightened suggestion of veracity. We disagree.

A

We review de novo allegations of constitutional violations such as a comment on the evidence. State v. Siers, 174 Wn.2d 269, 273-74, 274 P.3d 358 (2012); State v. Butler, 165 Wn. App. 820, 835, 269 P.3d 315 (2012). In conducting our assessment, we engage in a two-step inquiry. State v. Bass, 18

Wn. App. 2d 760, 802, 491 P.3d 988 (2021), review denied, 198 Wn.2d 1034 (2022). The inquiry requires, first: an examination of "the facts and circumstances of the case to determine whether a court's conduct or remark rises to a comment on the evidence," and whether the judge's personal feelings are implied by the remark. Bass, 18 Wn. App. 2d at 802-03. If the appellate court finds that the trial court made an improper comment, it then proceeds to the second step, wherein the appellate court presumes that the comment is prejudicial, and the State must "'show that the defendant was not prejudiced, unless the record affirmatively shows that no prejudice could have resulted.'" Bass, 18 Wn. App. 2d at 803 (quoting State v. Levy, 156 Wn.2d 709, 723, 132 P.3d 1076 (2006)).

B

Article IV, section 16 of our state's constitution provides: "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." The purpose of this prohibition on judicial comments on the evidence "is to prevent the jury from being influenced by knowledge conveyed to it by the court as to the court's opinion of the evidence submitted." Elmore, 139 Wn.2d at 275.

A trial court's statement constitutes a judicial comment on the evidence if the statement "reveal[s] the court's 'attitudes toward the merits of the case' or reflect[s] the court's personal opinion of any disputed issue before it." Bass, 18 Wn. App. 2d at 804 (quoting Levy, 156 Wn.2d at 721). Article IV, section 16's prohibition on such comments "forbids only those words or actions which have

16

the effect of conveying to the jury a personal opinion of the trial judge regarding the credibility, weight or sufficiency of some evidence introduced at the trial." State v. Jacobsen, 78 Wn.2d 491, 495, 477 P.2d 1 (1970). To determine whether a trial court's statement amounts to a comment on the evidence, we "look to the facts and circumstances of the case." Jacobsen, 78 Wn.2d at 495. "The fundamental question underlying our analysis of judicial comments is whether the mere mention of a fact . . . conveys the idea that the fact has been accepted by the court as true." Levy, 156 Wn.2d at 726.

C

Here, the trial judge referred to the forensic interview evidence as "testimony" when initially answering the jury's request to view the recording during its deliberations. Whether the jury should be allowed to view the recording was argued by the parties at length. Defense counsel argued against allowing the jury to watch the video recording during deliberations, contending that "the more they see, the more that it'll – it'll reinforce that message. And I think that's inappropriate."

However, the record demonstrates that the trial judge meaningfully discussed the available options with the attorneys to ensure that any replaying of the recorded interview would not be unfairly prejudicial. Ultimately, the judge authorized the jury's supervised single viewing of the recording.

Testimony is evidence, just as a photograph or other physical exhibits are evidence. Evidence is a category that includes a variety of subsets, one of which is testimony. Evidence is defined as "[s]omething (including testimony,

17

documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact; . . . [t]he collective mass of things, esp. testimony and exhibits, presented before a tribunal in a given dispute." BLACK'S LAW DICTIONARY 697-98 (11th ed. 2019).

Here, G.B.'s recorded utterances were no more emphasized than were any other piece of evidence allowed into the jury room during its deliberation. Other exhibits were also made available to the jury, including 13 photographs and the USB with surveillance footage of the family gathering at the Lattin house on July 9, 2021.

A video recording of an interview with a child may be treated more carefully, given its content, but here, the judge acted carefully and, upon request, allowed the jury to watch the video only one additional time, under bailiff supervision.

Contrary to Lattin's arguments, use of the word testimony was not akin to the trial court referring to a crowbar as a "deadly weapon," which relieved the State of its burden to prove that fact, see Levy, 156 Wn.2d at 722, or to "a few weeks" as a "prolonged period of time" as a matter of law. See State v. Brush, 183 Wn.2d 550, 559, 353 P.3d 213 (2015).

Lattin attempts to discount State v. Bogdanov, 27 Wn. App. 2d 603, 630, 532 P.3d 1035, review denied, 2 Wn.3d 1008 (2023), which held that a judge's mention of a charge as "a major homicide case" in front of a juror did not constitute a comment on the evidence. However, Bogdanov is instructive, especially in that it concludes:

Although the trial court's comment may have conveyed the judge's personal attitude about the *seriousness* of the case, it did not convey the judge's personal attitude about the *merits* of the case. The comment does not suggest something about the veracity of any witness, the importance of any piece of evidence, or, more broadly, the strength of any party's case.

Bogdanov, 27 Wn. App. 2d at 630 (emphasis added).

Here, the trial judge did not use the term testimony to refer to the merits of the case, nor did the judge's utterance suggest anything about the veracity of any witness or the importance of the evidence. The term did not even convey the seriousness of the case. Rather, it described a component of the evidence as distinct from a photograph or other possible forms of evidence. "Testimony" was, rather, another way to refer to the spoken words of G.B. in her recorded interview with Deputy Dixon. There was no overemphasis in the trial judge's use of the word. Accordingly, the trial court's statement did not constitute a prohibited comment on the evidence.

IV

Lattin next contends that he was denied his constitutional right to effective assistance of counsel during sentencing. This is so, Lattin avers, because his attorney failed to object to the trial court's ruling that Lattin was ineligible for the SSOSA. This assertion fails.

Lattin also contends that he was denied effective assistance of counsel when his attorney did not request a mistrial after the judge's alleged comment on the evidence. This argument also fails.

19

A

We review an ineffective assistance of counsel claim de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution, a defendant is guaranteed the right to effective assistance of counsel in criminal proceedings. Strickland v. Washington, 466 U.S. 668, 684-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish ineffective assistance of trial counsel, a petitioner must demonstrate both (1) that his attorney's representation was deficient in that the attorney's conduct fell below an objective standard of reasonableness, and (2) that prejudice resulted from the deficiency: there was a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Failing to satisfy either requirement ends the inquiry. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). Deficient performance occurs when counsel's performance falls below an objective standard of reasonableness. State v. Stenson, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997). A strong presumption of effective assistance exists and the defendant bears the burden of demonstrating an absence in the record of a strategic basis for the challenged conduct. McFarland, 127 Wn.2d at 335. There is a strong presumption that a defendant received effective representation. McFarland, 127 Wn.2d at 336.

B

Lattin contends that he received ineffective assistance of counsel when his attorney did not object to the denial of the SSOSA. Lattin argues that, although his defense counsel did argue that Lattin met the criteria for a SSOSA, counsel did not object to the court's actual ruling that he was not eligible. Lattin utilizes this position as a fall back position, but we have already held that there was no legal error when the court denied Lattin's request for a SSOSA.

According to the Sentencing Reform Act of 1981, a criminal "sentence within the standard range . . . for an offense shall not be appealed." RCW 9.94A.585(1). However, "[a] criminal defendant may nonetheless challenge a standard range sentence where he challenges not the length of the sentence, but rather the trial court's interpretation of the SSOSA statutes." Adamy, 151 Wn. App. at 587. This means that Lattin's counsel was not required to object at trial, after the court ruled, in order to raise his SSOSA claim of error to us on appeal.

Furthermore, the record indicates that defense counsel argued at length for a SSOSA on behalf of Lattin in its memorandum to the court and also during the sentencing hearing. An objection immediately following the court's resultant decision during the sentencing hearing but before the trial judge's imposition of a term of incarceration would have run the risk of antagonizing the judge. Such a move would have been not only futile, but also a faulty strategy, potentially leading to a harsher sentence for Lattin. Upon the trial court's denial of the SSOSA request, a conceivable and more likely successful strategy for Lattin's attorney was to try to get the lowest minimum sentence within the standard

range, which is precisely what took place. Lattin's defense counsel then properly appealed the denial of the SSOSA request. Lattin's counsel has not been shown to have provided deficient assistance.

C

Finally, Lattin asserts that he received ineffective assistance of counsel when his attorney did not move for a mistrial, following the trial judge's reference to G.B.'s forensic interview as "testimony," thus allegedly commenting on the evidence. Again, we disagree.

A trial judge has broad discretion in determining when to declare a mistrial. However, "[a] mistrial is warranted only where 'the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried.'" Bogdanov, 27 Wn. App. 2d at 626 (quoting State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012)).

Because we have determined that the judge did not improperly comment on the evidence, no ineffective assistance of counsel claim is warranted. No deficient performance and no prejudice have been demonstrated by Lattin. The claim of error fails.

V

Lattin finally contends that one of his child molestation charges (the charge listed as count 3 in the information)[8] was not proved by a constitutionally sufficient

---

[8] In his brief, Lattin assigns error to the sufficiency of the evidence as to count 2 Br. of Appellant at 1. In the issue statement related to this assignment of error, however, Lattin refers to the charge as concerning the "incident [that] occurred in the car" and a "transient, and likely unintentional, swipe over clothing in the pubic area." Br. of Appellant at 2. In the argument section of his brief, Lattin discusses that "G.B. alleged a fleeting contact over clothing" "during a game of chase in the car." Br. of Appellant at 42, 43.

No. 86625-7-I/23

quantum of evidence.  However, that count was dismissed by the trial court upon motion by the State.  The issue is moot.

Affirmed.

Duyn, J.

WE CONCUR:

Colum, J.        Haffe, ACJ

In its brief, the State points out that count 2 was alleged to have occurred on July 9 and took place in a spare bedroom.  It further details that count 3 was alleged to have occurred on July 7 in a car.  And it points out that count 3 was dismissed.  Lattin did not file a reply brief.
Lattin's issue statement and entire argument in his brief concerned the facts of count 3.
If Lattin actually meant to challenge the sufficiency of the evidence of count 2, he has abandoned that claim.  We say this because
1. He provided no issue statement as to the sufficiency of the evidence as to count 2;
2. He provided no reasoned argument as to the sufficiency of the evidence as to count 2;
3. Instead, he provided an issue statement as to count 3;
4. Additionally, he provided argument as to the sufficiency of the evidence as to count 3; and
5. After the State pointed all of this out in its brief, he did not file a reply brief.