## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  58720-3-II |
| Respondent, | |
| v. | |
| LEE CARL LOVELL, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Lee C. Lovell appeals from his conviction on four counts of first degree child molestation.  Lovell argues that the trial court erred by (1) admitting evidence under ER 404(b) pursuant to the lustful disposition doctrine and by (2) declining to give a *Petrich*[1] instruction.  In a statement of additional grounds for review (SAG),[2] Lovell claims he received ineffective assistance of trial and appellate counsel.

We hold that the trial court did not err because (1) the challenged evidence was not admitted pursuant to the lustful disposition doctrine, and even if there was error, any error was harmless; and (2) a *Petrich* instruction was unnecessary because the State elected a separate and distinct act for each count charged during closing arguments.  We also hold that Lovell's SAG claims fail. Thus, we affirm Lovell's convictions.

---

[1] *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984), *abrogated in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 405-06 n.1, 756 P.2d 105 (1988).

[2] RAP 10.10.

No. 58720-3-II

FACTS

A.    DISCLOSURE AND INVESTIGATION

On September 12, 2020, A.W.[3] told her mother, L.U., that Lovell touched her inappropriately earlier that day.  Lovell is A.W.'s grandmother's significant other.  A.W. was nine years old at the time of the disclosure.

L.U. immediately contacted A.W.'s father, P.W., repeated A.W.'s allegations, and had A.W. disclose what happened to P.W.  Because A.W. told L.U. that Lovell only touched her on, rather than in, her vagina, L.U. took A.W. straight home instead of to a hospital.  At home, L.U. collected A.W.'s clothing and put them in a brown paper bag.

L.U. subsequently contacted a friend to see how she should proceed, and L.U.'s friend's husband, an FBI agent, put L.U. in contact with the Washington State Patrol (WSP).  The following day, WSP interviewed L.U. and P.W.  A child forensic interviewer, Keri Arnold, also interviewed A.W., which was video recorded.

Law enforcement arrested Lovell on September 18.  The State subsequently charged Lovell by amended information with four counts of first degree child molestation.  The charging period for each count was August 1, 2018 to September 12, 2020.

B.    PRETRIAL

Prior to trial, the trial court held a child hearsay hearing to determine whether A.W.'s statements describing sexual abuse to various individuals would be admissible at trial.  After

---

[3] We use initials to protect the victim's identity and privacy interests.  *See* Gen. Order 2023-2 of Div. II, *Using Victim Initials* (Wash. Ct. App.), available at: https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2023-2&div=II.

hearing testimony from L.U., P.W., and Arnold, the trial court ruled that A.W.'s statements disclosing sexual abuse to each of those individuals would be admissible at trial under the child hearsay statute.

Also prior to trial, Lovell moved to exclude any prior bad act evidence pursuant to ER 404(b). Before the trial court, Lovell stated that it was his understanding that the State would offer a music video he and A.W. watched on September 12 into evidence. The music video—"Sunscreen" by Skylar Grey—depicts Grey singing, walking, and lounging in a variety of two-piece swimsuits. *See* Ex. 1. Grey also licks an ice cream cone and rubs or drips ice cream over her neck, stomach, thighs, and butt.

Lovell argued that the act of showing A.W. the music video was a prior bad act subject to an ER 404(b) analysis, and that the substance of the music video was more prejudicial than it was probative. Lovell had no objection to evidence that the music video was watched at a certain time.

The State argued that the music video was admissible for two reasons.[4] First, the fact that A.W. and Lovell watched the music video bolstered A.W.'s credibility by corroborating her version of events on September 12. Second, the substance of the music video was probative of Lovell's "mental state" when he touched A.W. 4 Verbatim Rep. of Proc. (VRP) at 195. Specifically, the State argued the music video's substance was relevant to show Lovell's intent to sexually gratify himself when he touched A.W.: "[W]hen we are talking about gratifying sexual desires, I think [Lovell's] intent does play into that, and I think the fact that he is showing and

---

[4] The State initially argued that ER 404(b) did not apply, and that ER 403 should control the trial court's analysis. However, the trial court proceeded "on the assumption this falls under 404(b)" and admitted the evidence pursuant to that rule. 4 Verbatim Rep. of Proc. (VRP) at 198.

watching with her a very sexualized video does factor into that intent and sexual gratification." 4 VRP at 196.

Lovell responded that there was "no indication from anybody, including [A.W.], that there was any sort of sexual gratification, stimulation, or anything resulting from the viewing of this video." 4 VRP at 197. For example, Lovell alleged that A.W.'s grandmother was in the room when he and A.W. watched the music video.

The trial court conducted an ER 404(b) analysis on the record. The trial court found that the music video was relevant because it "bolsters [A.W.'s] credibility . . . because she's describing a set of events that occurred on a particular day." 4 VRP at 198. The trial court also found that the substance of the music video was relevant because it suggested Lovell watched the video with A.W. to gratify himself sexually, "as opposed to just play time with a small child." 4 VRP at 199.

The trial court then found that the music video was not substantially more prejudicial than it was probative for two reasons. First, the trial court stated that if Lovell proved his version of events surrounding the playing of the music video, the jury was unlikely "to believe that the theory advanced . . . by the State has particular merit." 4 VRP at 199. Second, the trial court noted that in today's day and age, "a lot of music videos are rather sexualized and scandalous . . . and I think people are fairly familiar with that." 4 VRP at 200. Thus, the trial court ruled that the music video would be admissible "for the limited purpose of attempting to demonstrate sexual gratification." 4 VRP at 200. The trial court also told Lovell that it would read the jury a limiting instruction if defense counsel drafted one. The defense did not propose a limiting instruction.

4

C.     TRIAL

1.     A.W.'s Testimony

At trial, A.W. testified that while she had trouble remembering how often Lovell touched her, she thought it "happened multiple times." 4 VRP at 347. A.W. estimated that Lovell touched her two or three times before she disclosed to L.U.

A.W. also testified that, as best as she could remember, Lovell started acting inappropriately towards her when she and her family took a trip to Westport. A.W. recalled that during that trip, she found herself upstairs alone with Lovell. A.W. went to change her clothes in a bathroom and caught Lovell peeking around a corner at her. When Lovell peeked a second time, A.W. had her pants down; A.W. pulled her pants up and told Lovell to go away. Lovell left for a few seconds, returned, peeked at A.W. a third time, and then went downstairs.

A.W. also described what Lovell did to her on September 12, recounting how he used his hand to touch her "private part." 4 VRP at 346. A.W. testified that the touching occurred while she and Lovell were playing a game where Lovell would pick A.W. up and throw her onto the bed. A.W. testified that Lovell touched her at least once that day.

A.W. further testified regarding the aforementioned music video. A.W. stated that she and Lovell watched the music video "either the visit before I told my mom or the day that I did tell my mom." 4 VRP at 359. A.W. testified that the music video involved "ice cream" but was not "an ad for ice cream." 4 VRP at 359. On redirect, A.W. testified that the music video depicted "a girl" in "a black bikini" "dabbing or smearing the ice cream all over her arms and, like, her neck and stuff." 5 VRP at 453. The music video was "weird and gross" and made A.W. feel "uncomfortable." 5 VRP at 453, 454. According to A.W., Lovell commented that the artist had

5

"a really pretty voice" and that the music video was made during the COVID quarantine. 4 VRP at 359. A.W. could not remember whether she and Lovell watched the music video before or after Lovell touched her, but did recall that they watched the entire thing and that A.W.'s grandmother was not in the room when they did.

During cross examination, Lovell highlighted several inconsistencies between A.W.'s pretrial statements and her trial testimony. For example, A.W. acknowledged initially telling L.U. that Lovell only touched her once, whereas she told the forensic interviewer it happened multiple times. And A.W. could not recall giving the forensic interviewer approximate dates for the incidents of sexual abuse. A.W. was presented with photos of the house her family rented in Westport and acknowledged that it was a one story home with no stairs, contrary to her earlier testimony regarding the peeking incident occurring in a house with a staircase. Overall, Lovell's cross examination highlighted that A.W.'s trial testimony was much less certain and detailed than the statements she made during her forensic interview and her interview with defense counsel.

2.      Forensic Interview

The State offered, and the trial court admitted, a recording of A.W.'s forensic interview into evidence following A.W.'s trial testimony.[5]

During the forensic interview, A.W. stated that "it all started" when her family took a trip to Westport. Ex. 17 at 12. A.W. estimated that the trip occurred in January 2020. A.W. then recalled the peeking incident mentioned above.

---

[5] The recording is not included in the record on appeal. However, the trial court admitted a transcript of the interview for demonstrative purposes at trial. The transcript is included in the record on appeal, and any references to statements made during the interview are drawn from the transcript.

A.W. recalled the first time Lovell touched her.  A.W. stated that the touching occurred at Lovell's home, in February, about a month after the Westport trip.  A.W. stated: "I let [Lovell] throw me on the bed and then he reached down my pants while he was . . . tickling me and touching me . . . in a way I didn't like."  Ex. 17 at 14.  Lovell touched A.W.'s skin "on the place where I go to the bathroom."  Ex. 17 at 16.  Lovell "[j]ust cupped" the area, and did not touch "in there."  Ex. 17 at 17, 18.  Before Lovell touched A.W., "he sigh[ed] a deep heavy sigh and then scanned me [up and down] uncontrollably."  Ex. 17 at 15.

A.W. described a second incident in April.  "Same thing as the first time," except Lovell touched A.W. over her underwear.  Ex. 17 at 22.  This touching occurred at A.W.'s home.

The third and fourth incidents A.W. described occurred in September.  A.W. recalled Lovell touching her while he threw her on his bed.  "And before he [touched me], he heave[d] a deep sigh and then just look[ed] at me very, very weirdly."  Ex. 17 at 12.  That day was also the day Lovell and A.W. watched the "Sunscreen" music video.  Ex. 17 at 27.  Lovell touched A.W. "twice, one before the video and then one time after the video."  Ex. 17 at 29.  Lovell touched A.W. on her bare skin both times.

A.W. also described the music video during her forensic interview.  A.W. stated that Lovell "made me watch a music video Sunscreen by somebody."  Ex. 17 at 27.  "[I]t was a music video and it was [the artist] and her boyfriend making the video.  And she was in swimsuits swimming in pools about it and stuff."  Ex. 17 at 28.  In the music video, the artist rubbed ice cream over her chest and neck.  "Just everything about" the music video made A.W. "uncomfortable."  Ex. 17 at 29.

7

3. Family Dynamics

Besides casting doubt on A.W.'s credibility, Lovell's defense was to suggest that A.W.'s allegations stemmed from her family's ill feelings towards Lovell. For example, L.U. testified that "there was strained relationships across the board within the . . . family," and that the ex-husband of A.W.'s grandmother "blamed [Lovell] for getting in the middle of their marriage." 4 VRP at 311. L.U. described P.W.'s relationship with Lovell as "non-existent." 4 VRP at 312. During cross examination, L.U. acknowledged telling WSP officers that P.W. "'hated'" Lovell. 4 VRP at 314. L.U. denied telling A.W. that A.W.'s grandmother chose the wrong person.

P.W. also testified regarding his family's dynamics. P.W. testified that when his mother and father first separated, he was "angry at everybody" but did not blame Lovell for the subsequent divorce. 5 VRP at 486. P.W. stated that one time he went to visit Lovell and Lovell tried to put his arm around P.W.; P.W. "shoved him away, and that was the extent of the incident." 5 VRP at 489. However, during cross examination, P.W. was presented with statements from his WSP interview in which P.W. described the incident as much more violent: P.W. told WSP he knocked Lovell out and smashed Lovell's head into a wall four times. Finally, Lovell highlighted several statements P.W. and L.U. made to WSP that made P.W. seem more antagonistic towards Lovell than did P.W.'s trial testimony.

A.W.'s grandmother also testified. A.W.'s grandmother testified that P.W. was "angry" about her relationship with Lovell. 6 VRP at 591. She recalled P.W. and Lovell telling her how P.W. "assaulted" Lovell at one point. 6 VRP at 594. She also suggested that P.W. and his father broke into her car and home, and that the two had plans to "ambush" her and Lovell at a summer event. 6 VRP at 595.

8

Lovell did not testify, and he did not call any witnesses in his defense.

4.      Jury Instructions

Prior to closing arguments, Lovell proposed the following *Petrich* instruction:

> The State alleges that the defendant committed acts of child molestation in the first degree on multiple occasions. To convict the defendant on any count of child molestation in the first degree, one particular act of child molestation in the first degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of child molestation in the first degree.

Clerk's Papers (CP) at 141.

The State objected and asked that the following jury instruction be given instead:

> In alleging that the defendant committed Child Molestation in the First Degree, the State relies upon evidence regarding a single act constituting each count of the alleged crime. To convict the defendant on any count, you must unanimously agree that this specific act was proved.

CP at 95. The State also chose to specify during closing arguments which acts supported which counts.

The trial court declined to give Lovell's proposed *Petrich* instruction. The trial court explained that a *Petrich* instruction was not necessary because (1) "what the State is electing to do is rely on [the] four instances that [A.W.] described" in the forensic interview, and (2) all four to-convict instructions stated that each count was premised on an act of sexual contact "separate and distinct from those acts alleged in" the remaining counts. 8 VRP at 873; CP at 90, 91, 92, 93.

In addition to the State's proposed instruction regarding unanimity on specific acts, the trial court instructed the jury, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." CP at 94.

9

5.      Closing Arguments

a.      State's closing arguments

During closing arguments, the State reminded the jury that "there's a separate action for each count." 8 VRP at 876. The State then elected a specific act for each count charged. For count 1, the State elected "the first incident after, quote, Westport" in February. 8 VRP at 877. Later, the State said, "So what does [A.W.] say about the acts for Count I?" and then played a portion of A.W.'s forensic interview. 8 VRP at 888.

Also, the State acknowledged that P.W. testified that the family visited Westport in August 2018, rather than January 2020, as A.W. recalled. However, the State reminded the jury that P.W. also testified that the family took a trip to Roche Harbor in January 2019, and described the rental property they stayed in. P.W.'s description and photos of the home were consistent with A.W.'s recollection of the peeking incident being upstairs, as she described in her forensic interview and at trial. The State argued that A.W. was confused about the location where the peeking incident occurred: "She thinks she's talking about a house that they stayed in in Westport, when, in reality . . . the evidence shows, she's thinking of Roche Harbor." 8 VRP at 882. Thus, the State argued, whether the peeking incident occurred in August 2018 or January 2019, the molestation that followed it still fell within the charging period.

For count 2, the State elected "the second incident after, quote, Westport. [A.W.] believes this was April." 8 VRP at 877. And like it did for count 1, the State acknowledged the discrepancies between A.W.'s timeline and evidence that the Westport trip occurred much earlier than A.W. remembered. Thus, as with count 1, the State argued that whether the peeking incident occurred in August 2018 or January 2019, the molestation that followed still fell within the

charging period. Later, the State said, "What does [A.W.] specifically say about Count II?" and played a portion of A.W.'s forensic interview. 8 VRP at 889.

For counts 3 and 4, the State elected the two incidents A.W. recounted from September 12, 2020: "Count III being before the music video was watched and Count IV being for after the music video was watched." 8 VRP at 877. Unlike counts 1 and 2, A.W. consistently recalled counts 3 and 4 occurring around September 12. The State also reminded the jury that while it was discussing counts 3 and 4 together, "you are deciding these separately and independently of each other." 8 VRP at 890. The State then played a portion of A.W.'s forensic interview.

The State reminded the jury:

> So again, we have specific acts of this sexual contact that has to occur on four separate occasions. And I want to be clear about that. Each count is a separate count. You have to consider each one individually. And the State is saying these counts apply to these specific acts. This is what you're supposed to consider.

8 VRP at 888. The State continued, "You've heard some testimony about something happened during . . . a Christmas party. . . . That's not on here. We don't have the specific date of that. We are not considering that when you're considering whether [Lovell is] guilty of Counts I, II, III, and IV." 8 VRP at 888.

The State also published the "Sunscreen" music video during closing arguments.

Finally, during rebuttal, the State reiterated its elections:

> [T]here was the first time after this Westport visit, and honestly, whether it's Westport or whether it's Roche Harbor, don't get confused by it, because at the end of the day, that's just a marker point for her. That's the date for her. The second time, after Westport. And two times on the 12th: Before the video and after the video.

8 VRP at 935-36.

11

b.      Lovell's closing arguments

During his closing, Lovell argued that the jury should not believe A.W. because her story changed from her forensic interview to her defense interview to trial. Lovell went on to highlight the many reasons the jury should doubt that Lovell molested A.W., including the inconsistencies between A.W.'s pretrial statements and her trial testimony, the lack of corroborating testimony, the family dynamics, and testimony from A.W.'s grandmother that she never saw any abuse occur. Lovell ended his closing arguments by reminding the jury, "[Y]ou'd have to agree, unanimously agree, that each specific incident was proven beyond a reasonable doubt to find guilt of any one count." 8 VRP at 917.

D.      DELIBERATIONS, VERDICT, AND SENTENCING

During jury deliberations, the jury asked the trial court, "Prosecution narrowed the scope of the 4x charges to specific times (ex. Before video); however, Instructions (10-13) list a broad window. Does the Jury have to only focus the 4 periods specified or do we have latitude?" CP at 77. The trial court answered, "[Y]ou may only focus on the four periods specified. See instruction number 15." CP at 77. Instruction 15 stated:

> In alleging that the defendant committed Child Molestation in the First Degree, the State relies upon evidence regarding a single act constituting each count of the alleged crime. To convict the defendant on any count, you must unanimously agree that this specific act was proved.

CP at 95.

The jury found Lovell guilty as charged. The trial court sentenced Lovell to an indeterminate sentence of 198 months to life, with credit for time served, and lifetime community custody.

12

Lovell appeals.

ANALYSIS

A.     ER 404(b)

Lovell argues that the trial court erred by admitting the "Sunscreen" music video pursuant to the lustful disposition exception to ER 404(b), contrary to *State v. Crossguns*, 199 Wn.2d 282, 505 P.3d 529 (2022).  We disagree.

1.     Legal Principles

ER 404(b) prohibits the admission of "'evidence of other crimes, wrongs, or acts . . . to prove character and show action in conformity therewith.'"  *State v. Denham*, 197 Wn.2d 759, 771, 489 P.3d 1138 (2021) (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)).  However, evidence of a defendant's prior acts "'may be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'"  *Id.* (internal quotation marks omitted) (quoting *Powell*, 126 Wn.2d at 258).

To admit evidence pursuant to ER 404(b),

> "[T]he trial court must (1) identify the purpose for which the evidence is sought to be introduced, (2) determine whether the evidence is relevant to prove an element of the crime charged and (3) weigh the probative value of the evidence against its prejudicial effect.  Additionally, the party offering the evidence of prior misconduct has the burden of proving by a preponderance of the evidence that the misconduct actually occurred."

*Id.* (quoting *State v. Lough*, 125 Wn.2d 847, 853, 889 P.2d 487 (1995)).  The above analysis must be conducted on the record.  *State v. Arredondo*, 188 Wn.2d 244, 257, 394 P.3d 348 (2017).

We review a trial court's admission of evidence pursuant to ER 404(b) for an abuse of discretion.  *Denham*, 197 Wn.2d at 771.  A trial court abuses its discretion when its decision "is

13

manifestly unreasonable or based on untenable grounds or reasons." *State v. Sanjurjo-Bloom*, 16 Wn. App. 2d 120, 125, 479 P.3d 1195 (2021).

        b.       *State v. Crossguns*

In *Crossguns* our Supreme Court addressed the lustful disposition doctrine. 199 Wn.2d at 285. "In Washington, the 'lustful disposition' doctrine has been used as a means to admit evidence of prior, uncharged acts by the defendant against the same victim." *Id.* at 290.

In *Crossguns*, R.G.M. disclosed to her mother that her father, Crossguns, had been abusing her for over a year. *Id.* at 286. The State subsequently charged Crossguns with one count of second degree rape of a child and one count of second degree child molestation. *Id.* Prior to trial, the State sought admission of evidence of prior "uncharged sexual abuse of R.G.M. by Crossguns" in the form of testimony from other family members. *Id.* at 286-87. The trial court admitted the evidence primarily to prove Crossguns' lustful disposition towards R.G.M. *Id.* at 287.

Our Supreme Court addressed whether lustful disposition was still "a distinct purpose for admitting evidence under ER 404(b)." *Id.* at 290. The court held that:

> the term "lustful disposition" must be rejected and . . . it may no longer be cited as a distinct purpose for admitting evidence under ER 404(b). However, we do not disturb our precedent permitting evidence of collateral misconduct relating to a specific victim for appropriate purposes under ER 404(b), including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

*Id.* Thus, the court did not "disturb our precedent permitting evidence of collateral misconduct relating to a specific victim under ER 404(b)." *Id.* at 294. In fact, "due to the nature of the crimes of rape and of child sexual abuse, the evidence of other uncharged sexual misconduct may be admissible as part of the crime itself in appropriate cases." *Id.* According to the court, "'lustful

disposition' is more akin to a permissible showing of intent, motive, opportunity, common scheme or plan, preparation, and absence of accident or mistake." *Id.* at 293.

2.  Trial Court Did Not Abuse Its Discretion

At no point did either party or the trial court suggest that the music video was being offered to prove Lovell's lustful disposition towards A.W. Rather, the State offered the music video to prove Lovell's intent to sexually gratify himself by touching A.W. immediately before and after watching the music video with her. Specifically, the State argued that "when we are talking about gratifying sexual desires, I think [Lovell's] intent does play into that, and I think the fact that he is showing and watching with [A.W.] a very sexualized video does factor into that intent and sexual gratification." 4 VRP at 196. And the trial court admitted the music video "for the limited purpose of attempting to demonstrate sexual gratification." 4 VRP at 200.

Lovell argues that even if nobody used the label "lustful disposition" before or during trial, the trial court still improperly admitted the music video to show Lovell's lustful disposition towards A.W. Amend. Br. of Appellant at 38 ("Although the Supreme Court's words 'lustful disposition' were never uttered during [Lovell's] trial, they may as well have been."). We disagree.

The record shows that the State offered the music video evidence to prove that when Lovell touched A.W. on September 12, his intent was to sexually gratify himself, *not* to show that Lovell touched A.W. because he was lustfully disposed towards her. And the trial court found the music video was relevant to demonstrate sexual gratification. Moreover, contrary to Lovell's argument, it is unlikely that the jury considered the music video evidence as "propensity evidence." *Crossguns*, 199 Wn.2d at 292. As the *Crossguns* court explained, part of the problem with the

various labels used to describe lustful disposition evidence—"'depraved sexual instinct,'"[6] "'unnatural lust,'"[7] "'lewd disposition'"[8]—was that they "incorrectly suggest that evidence admitted under the 'lustful disposition' label may be used as propensity evidence." *Id.* at 292. But the same danger is not present here. Unlike in *Crossguns*, showing A.W. the music video was not "uncharged sexual misconduct" similar to the molestation Lovell was actually charged with. *Id.* at 296. And it is not likely that the music video could be used as propensity evidence. There is simply no likelihood that showing A.W. a music video would lead to a conclusion that Lovell had a propensity to molest A.W.

Thus, the record shows that the trial court did not admit the music video pursuant to the lustful disposition doctrine, and it is unlikely the jury could consider the music video as propensity evidence.

Lovell also argues that the trial court erred in admitting the music video because the video was more prejudicial than it was probative. We disagree.

In determining whether evidence is admissible under ER 404(b), the trial court must weigh the probative value of the evidence against its prejudicial effect. *Denham*, 197 Wn.2d at 771. Here, the trial court found that the music video was not substantially more prejudicial than it was probative. The trial court found the music video was probative of sexual gratification. And the

---

[6] *Id.* at 292 (internal quotation marks omitted) (quoting *State v. Bernard*, 849 S.W.2d 10, 16 (Mo. 1993), *overruled in part on other grounds by State v. Vorhees*, 284 S.W.3d 585, 595 n.5 (Mo. 2008)).

[7] *Id.* (quoting *State v. Edwards*, 224 N.C. 527, 528, 31 S.E.2e 516 (1944)).

[8] *Id.* (internal quotation marks omitted) (quoting *State v. Tobin*, 602 A.2d 582, 531 (R.I. 1992)).

trial court explained that the music video's prejudicial value would be relatively low if the jury accepted Lovell's assertion that A.W.'s grandmother was in the room when he and A.W. watched the music video. *See* 4 VRP at 199 ("I don't necessarily think that the showing of the video . . . under the circumstances as described by defense counsel, would lead one to believe that the theory advanced here by the State has particular merit."). The trial court also noted that "whether we like it or not, a lot of music videos are rather sexualized and scandalous, so to speak, and I think people are fairly familiar with that." 4 VRP at 200. Thus, the trial court appropriately weighed the evidence's probative value against its prejudicial value before concluding any prejudicial value did not substantially outweigh any probative value.

On appeal, Lovell fails to explain how the trial court abused its discretion in its weighing of the probative value of the music video against its prejudicial effect. Rather, Lovell's arguments seem to go to the weight, rather than the admissibility, of the evidence. For example, Lovell argues that music video's "prejudicial impact was massive" "because there was no evidence whatsoever even minimally arguable related to sexual gratification except 1) the video, 2) the child's disavowed statements of being 'looked up and down,' and 3) [Lovell's] sighs." Amend. Br. of Appellant at 44.[9] Lovell appears to make a sufficiency of the evidence argument, discussed below, rather than explaining how the trial court abused its discretion in its weighing of the probative value of the music video against its prejudicial effect.

---

[9] Lovell's argument highlights that even if the trial court abused its discretion in admitting the music video, any error was harmless. In light of the other evidence presented to show sexual gratification (e.g., A.W. stating that when Lovell touched her, he would "sigh[] a deep heavy sigh and then scan[] [A.W.] uncontrollably before he" touched her), there is a reasonable probability that the outcome of the trial would not have been materially affected if the music video had not been admitted. Ex. 17 at 15; s*ee State v. Gunderson*, 181 Wn.2d 916, 926, 337 P.3d 1090 (2014).

Lovell also argues that the evidence at trial did not conclusively show how much of the music video A.W. watched. While A.W. and her grandmother may have disagreed as to how much of the music video A.W. watched, that determination was for the jury to make based on its assessment of credibility and goes to the weight, not the admissibility, of the music video evidence.

Finally, Lovell suggests that the music video was probative of sexual gratification only as to count 4. Even if this is true, the music video was still probative evidence as to one count.

Lovell's arguments emphasize the allegedly low probative value of the music video. But ER 404(b) requires a determination of whether the probative value of the evidence is outweighed by its prejudicial value. The trial court did that. Lovell fails to show that the trial court abused its discretion because the evidence was so prejudicial that it outweighed any probative value. Thus, Lovell's challenge to the trial court's admission of the music video fails.

B.    SUFFICIENCY OF THE EVIDENCE

Lovell appears to sporadically make arguments in his opening brief that there was insufficient evidence to support his convictions. The State responds that because Lovell did not raise sufficiency of the evidence as an assignment of error, the argument is waived. However, Lovell's sporadic arguments regarding the sufficiency of the evidence raised in his opening brief were sufficient to allow the State to recognize that he is challenging the sufficiency of the evidence. Therefore, we address the issue.

When addressing a challenge to the sufficiency of the evidence, we "'view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Conaway*,

199 Wn.2d 742, 748-49, 512 P.3d 526 (2022) (quoting *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009)).

"A person is guilty of child molestation in the first degree when the person has, or knowingly causes another person under the age of eighteen to have, sexual contact with another who is less than twelve years old and the perpetrator is at least thirty-six months older than the victim." RCW 9A.44.083(1). "'Sexual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010(13).

At trial, the parties stipulated that the age and marriage elements of the crime had been proved beyond a reasonable doubt. On appeal, Lovell argues there was insufficient evidence of sexual contact between him and A.W. We disagree.

At trial, although A.W. had difficulty recalling all of the times Lovell abused her, A.W. did testify that it "happened multiple times." 4 VRP at 347. Moreover, A.W. described four distinct acts in her forensic interview, which was played for the jury. A.W. recounted that the first time Lovell touched her was in February, about a month after the Westport trip. Lovell touched A.W. "where [she] go[es] to the bathroom." Ex. 17 at 16. The second touching A.W. described occurred in April; this touching was the "[s]ame thing as the first time," except Lovell touched A.W. over her underwear this time. Ex. 17 at 22. The third and fourth incidents that A.W. described occurred in September, the same day Lovell and A.W. watched the "Sunscreen" music video. Lovell touched A.W. on her bare skin "twice, one before the video and then one time after the video." Ex. 17 at 29. Thus, there was sufficient evidence that Lovell touched A.W.'s "sexual or other intimate parts" on four separate occasions. RCW 9A.44.010(13). Lovell's arguments to the

contrary attack the jury's determination that A.W. was a credible witness, and we will not review such determinations on appeal. *State v. Bass*, 18 Wn. App. 2d 760, 780, 491 P.3d 988 (2021), *review denied*, 198 Wn.2d 1034 (2022).

Lovell also argues that even if there was sufficient evidence that Lovell touched A.W., there was insufficient evidence that he did so to sexually gratify himself. We disagree.

A.W.'s forensic interview provided the necessary evidence of sexual gratification. During her forensic interview, A.W. was asked about how Lovell's behavior toward her changed after A.W. caught him peeking at her. A.W. described how Lovell would "sigh[] a deep heavy sigh and then scan[] [A.W.] uncontrollably before he" touched her. Ex. 17 at 15. A.W. said the sigh was "weird" and did not make her "feel good." Ex. 17 at 15. A.W. described the scan as Lovell scanning her "up and down." Ex. 17 at 16. When asked about the second time Lovell touched her compared to the first time, A.W. stated, "Same thing as the first time. It's been the same thing as the first time it happened." Ex. 17 at 22. A.W. also recalled that the touching on September 12 was "almost the same thing as the first time, just without my cousins. . . . It's basically the same, the same first time, as the first time." Ex. 17 at 23.

A rational trier of fact could find that by sighing and scanning A.W. before he touched her, Lovell demonstrated that he was touching A.W. to sexually gratify himself. Furthermore, during her forensic interview, A.W. was asked to describe Lovell's hand when he touched her, and she responded, "Like a crow that's gonna grab you," and "Like a vulture or something about to grab its prey." Ex. 17 at 18. Moreover, the State presented evidence that the abuse on September 12—counts 3 and 4—preceded and followed the viewing of a music video with sexual innuendos, further suggesting that Lovell touched A.W. to sexually gratify himself.

20

Lovell argues that because A.W. could not recall the sighing and scanning in relation to Lovell's abuse at trial, her forensic interview statements are insufficient evidence of sexual gratification. However, this asks the court to make a credibility determination, and we cannot. *Bass*, 18 Wn. App. 2d at 780.

Lovell also argues that some evidence at trial suggested Lovell had a bad back that could explain the sighing. Once again, Lovell's argument would require this court to make a credibility determination we cannot make. *Id.* Because a rational trier of fact could find that the State proved, beyond a reasonable doubt, that Lovell touched A.W.'s private or intimate parts on four separate occasions to sexually gratify himself, Lovell's sufficiency of the evidence argument fails.

C.    *PETRICH* INSTRUCTION

1.    Legal Principles

Criminal defendants have a constitutional right to a unanimous jury verdict. *State v. Aguilar*, 27 Wn. App. 2d 905, 924, 534 P.3d 360 (2023). In cases where the evidence reveals "'several distinct criminal acts'" but the defendant is charged with less acts than the evidence reveals, "'jury unanimity must be protected.'" *State v. Carson*, 184 Wn.2d 207, 217, 357 P.3d 1064 (2015) (quoting *Petrich*, 101 Wn.2d at 572). To ensure a unanimous verdict in such a situation, "'[t]he State may, in its discretion, elect the act upon which it will rely for conviction. Alternatively, if the jury is instructed that all 12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt, a unanimous verdict . . . will be assured.'" *Id.* (quoting *Petrich*, 101 Wn.2d at 572).

Thus, "in a multiple acts case, one of two things must occur: either (1) the State may tell the jury on what act to rely in its deliberations or (2) the court may instruct the jury that it must

unanimously rely on a specific criminal act to support its conviction." *Aguilar*, 27 Wn. App. 2d at 924. "To avoid constitutional error, any election must 'clearly identif[y]' the act on which the charge in question is based." *Id.* (internal quotation marks omitted) (alteration in original) (quoting *Carson*, 184 Wn.2d at 227). We review alleged *Petrich* instruction errors de novo. *Id.*

> 2. *Petrich* Instruction Not Required

Lovell argues that he was entitled to a *Petrich* instruction and that the trial court violated his constitutional right to a unanimous jury verdict when it opted against giving one.[10, 11] We disagree.

Here, the jury was instructed repeatedly that it must decide each count separately and that any decision to convict on any count must be unanimous. For example, the jury was instructed that "[a] separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." CP at 94. Furthermore, the jury was instructed, "As jurors, you have a duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict." CP at 84. The jury was also instructed that "[i]n alleging that the defendant committed Child Molestation in the First Degree, the State relies upon evidence regarding a single act constituting each count of the alleged crime. To convict the defendant on any count, you must unanimously agree that this specific act was proved." CP at 95.

---

[10] In his briefing addressing the *Petrich* instruction, Lovell argues that there was insufficient evidence for all but one count: "But what could [the jury] agree upon for the amorphous 'February' and 'April' incidents? There were no specific acts denoted for those incidents at all." Amend. Br. of Appellant at 56. Once again, it appears that Lovell attempts to present a sufficiency of the evidence argument disguised as an alleged jury instruction error.

[11] We admonish appellant counsel's use of "'Chinese Menu'" in describing the multiple choices that the jury faced. *See* Amend. Br. of Appellant at 57. Such language is wholly inappropriate.

Also, each to-convict instruction included the following language: "That between the 1st day of August, 2018, and 12th day of September, 2020, the defendant had sexual contact with A.W., *separate and distinct* from those acts alleged in" the remaining counts. CP at 90, 91, 92, 93 (emphasis added). We presume that a jury follows the trial court's instructions. *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012).

In addition to being instructed by the trial court that each count was premised on a separate and distinct act, the State clearly elected a distinct act for each count during closing arguments. For count 1, the State elected "the first incident after, quote, Westport" in February. 8 VRP at 877. For count 2, the State elected "the second incident after, quote, Westport" in April. 8 VRP at 877. For count 3, the State elected the first time Lovell touched A.W. on September 12, "before the music video was watched." 8 VRP at 877. For count 4, the State elected the second time Lovell touched A.W. on September 12, "after the music video was watched." 8 VRP at 877.

Moreover, the jury's questions during deliberations show that they understood the trial court's instructions, not that they were confused, as Lovell maintains. For example, the jury asked, "Instruction 4. Do you have to have a unanimous verdict for a 'not' guilty verdict?" CP at 72. This question suggests that the jury understood it had to unanimously decide guilt before returning a guilty verdict. The jury also asked whether it had to "only focus [on] the 4 periods specifi[ed] [by the State] or do we have latitude?" CP at 77. This question shows the jury understood the State's elections. The trial court answered the question by instructing the jury that it could "only focus on the four periods specified" and referred the jury to instruction 15. CP at 77.

In his reply brief, Lovell argues, "The only time a *Petrich* instruction is not required is if the State elects to prosecute the case as a *continuous course of conduct case*. But the State did not

do that here because there is no evidence to support that theory." Reply Br. of Appellant at 26-27 (emphasis in original). This argument misconstrues the *Petrich* instruction and is contrary to well-established rules that such an instruction is only necessary where the State does *not* elect at trial.[12]

Because the State clearly elected a specific act for each count charged during closing arguments, a *Petrich* instruction was unnecessary. Thus, the trial court did not err by denying Lovell's request for a *Petrich* instruction.

D.      SAG

RAP 10.10(a) allows criminal defendants to "file a pro se statement of additional grounds for review to identify and discuss those matters related to the decision under review." While defendants are not required to reference the record or cite legal authorities, this court "will not consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors." RAP 10.10(c).

1.      Ineffective Assistance of Trial Counsel

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014). To prevail on a claim of ineffective assistance of counsel, the defendant must show (1) deficient performance by counsel, and (2) that counsel's deficient performance prejudiced them. *Id.* at 32-33.

---

[12] Lovell also argues that cumulative error denied him a fair trial. Because Lovell fails to identify any errors, the cumulative error doctrine is inapplicable.

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Id.* at 33. This court applies "a strong presumption that counsel's performance was reasonable." *State v. Lawler*, 194 Wn. App. 275, 289, 374 P.3d 278, *review denied*, 186 Wn.2d 1020 (2016). "If defense counsel's conduct can be considered to be a legitimate trial strategy or tactic, counsel's performance is not deficient." *Id.*

As for the prejudice prong, the defendant must show that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Grier*, 171 Wn.2d at 34 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). An ineffective assistance claim fails if either deficient performance or prejudice is not shown. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

a.     Failure to present a defense

Lovell claims he received ineffective assistance of trial counsel because defense counsel did not inform him of the "negative consequences" of not putting on a case in chief. SAG at 3. Specifically, Lovell asserts that A.W.'s grandmother and other witnesses could shed more light on: the State's "confusing" timeline; the peeking incident; the family dynamics; viewing the "Sunscreen" music video; and sleeping arrangements between Lovell and A.W.'s grandmother. SAG at 4.

Lovell does not specify what information A.W.'s grandmother or other unnamed witnesses could have provided in his defense. Without such information, it is impossible to determine whether defense counsel performed deficiently by failing to present said evidence. Moreover, even if Lovell had provided specific information, any such evidence would be outside of the record on appeal. Claims relying on evidence outside the record should be brought in a personal restraint

petition. *See State v. McFarland*, 127 Wn.2d 322, 338 n.5, 899 P.2d 1251 (1995) ("[A] personal restraint petition is the appropriate means of having the reviewing court consider matters outside the record.").

Lovell also claims that he received ineffective assistance of counsel because defense counsel failed to call A.W.'s grandmother as a defense witness. Lovell contends that A.W.'s grandmother, "as well as others[,] could have painted a far more robust picture if called as . . . defense witness[es]." SAG at 6. If A.W.'s grandmother testified as a defense witness, "she could have gone farther than she could as a 'hostile' State witness pummeled about small inconsistencies between her initial voluntary statement to police and her trial testimony." SAG at 6. Failure to call A.W.'s grandmother as a defense witness deprived A.W.'s grandmother of the opportunity to explain her state of mind when she first spoke with police. As with his other claim, Lovell fails to specify what evidence A.W.'s grandmother and "others" would have added to his defense. SAG at 6.

Lovell also fails to explain how he was prejudiced by defense counsel's failure to put on a case in chief. Lovell claims that without more context, A.W.'s "story hung there, one-sided, throughout the trial, painting me as some sort of 'Peeking Tom.'" SAG at 4-5. Without more presented in Lovell's defense, "information negative towards [Lovell] hung there unrefuted and unexplained." SAG at 5. Lovell goes on, "[A.W.'s grandmother's] words were twisted and turned at trial. [Defense counsel's] decision to present no defense deprived her of explaining even herself." SAG 6. Lovell's vague and conclusory statements do not establish that but for defense counsel's allegedly deficient performance, the outcome of the trial would have been different. Thus, Lovell's ineffective assistance of counsel claim based on a failure to present a defense fails.

b.      Lesser included offenses

Next, Lovell claims that he received ineffective assistance of trial counsel because defense counsel did not tell him about any potential lesser included offenses. SAG at 7. Lovell states that while incarcerated, a fellow inmate alerted him to *State v. Bertrand*, a case recently decided by our Supreme Court. 3 Wn.3d 116, 546 P.3d 1020 (2024). Lovell claims:

> My understanding is that the cases have to do with trial defendants being told about their option to present their juries with "Lesser Included Offenses." Mr. Bertrand was not provided this option at trial and neither was I. This case may or may not help me (or Mr. Bertrand) in the end, but at least it is part of his appeal. I have been deprived of even that.

SAG at 7.

Here, Lovell fails to identify the nature and occurrence of the alleged error he claims occurred, much less whether there was even any error. Lovell also fails to identify any lesser included offense to which he believes he would have been entitled, much less show that he would have been entitled to an instruction on it had it been offered. *See* RAP 10.10(c). Thus, Lovell's ineffective assistance of counsel claim based on lesser included offenses fails.

c.      Conflict of interest

Finally, Lovell claims that he received ineffective assistance of trial counsel because defense counsel failed to inform Lovell "that there was an inherent conflict of interest if my appeal was handled by another lawyer associated with [defense counsel's] firm." SAG at 9. Lovell fails to identify the "inherent conflict of interest" presented when an appeal is handled by another lawyer associated with trial counsel's firm. Lovell also fails to identify any other conflict arising from trial counsel's representation. Thus, Lovell's ineffective assistance of counsel claim based on a conflict of interest fails.

27

2.      Ineffective Assistance of Appellate Counsel

Lovell claims he received ineffective assistance of appellate counsel for several reasons: Appellate counsel did not communicate with Lovell or A.W.'s grandmother; appellate counsel's opening brief was sloppy; appellate counsel requested several extensions to file appellate documents; and appellate counsel failed to raise an ineffective assistance of counsel claim in his appellate brief.

Lovell fails to show how the claimed deficiencies prejudiced him.  *See In re Pers. Restraint of Salinas*, 189 Wn.2d 747, 760, 408 P.3d 344 (2018) (an ineffective assistance of appellate counsel claim requires a showing of a meritorious legal issue appellate counsel failed to raise and prejudice).  Also, to the extent Lovell's claim relies on evidence outside the record, the claim should be made in a personal restraint petition.  *McFarland*, 127 Wn.2d at 338 n.5.  Therefore, Lovell's ineffective assistance of appellate counsel claim fails.

## CONCLUSION

The trial court did not abuse its discretion in admitting the music video evidence. Furthermore, a *Petrich* instruction was unnecessary because the State elected specific and distinct acts for each count during closing arguments.  Finally, Lovell's SAG claims fail.  Accordingly, we affirm Lovell's convictions.

No. 58720-3-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Veljacic, A.C.J.

Price, J.